# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| SCHÜTZ CONTAINER SYSTEMS, INC. | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:09-CV-3609-RWS |
| | : | |
| MAUSER CORPORATION and NATIONAL CONTAINER GROUP, LLC, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## ORDER

This case comes before the Court on Plaintiff Schütz Container Systems,

Inc. ("Schütz")'s Motion for Summary Judgment on Defendant National

Container Group, LLC ("NCG")'s Counterclaims **[184]**, Defendants Mauser

Corporation ("Mauser") and NCG's Motion for Summary Judgment on

Plaintiff's Trademark Claims (Counts II, IV-VI) **[187]**, Defendants Mauser and

NCG's Motion for Summary Judgment on Plaintiff's False Advertising Claims

(Counts III-VI) and Unjust Enrichment Claim (Count VII) **[188]**, and, finally,

Plaintiff's Motion for Leave to File Surreply Brief in Opposition to

Defendants'

Motions for Summary Judgment **[274]**. After reviewing the Record, the Court enters the following Order.

As a preliminary matter, the Court **DENIES** Plaintiff Schütz's Motion for Leave to File Surreply Brief in Opposition to Defendants' Motion for Summary Judgment ("Motion for Leave to File Surreply") **[274]**. "Neither the Federal Rules of Civil Procedure nor this Court's Local Rules authorize the filing of surreplies." Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005) (citing Byrom v. Delta Family Care-Disability & Survivorship Plan, 343 F. Supp. 2d 1163, 1188 (N.D. Ga. 2004)). "To allow such surreplies as a regular practice would put the court in the position of refereeing an endless volley of briefs." Garrison v. N.E. Ga. Med. Ctr., Inc., 66 F. Supp. 2d 1336, 1340 (N.D. Ga. 1999). Rather, surreplies typically will be permitted only in unusual circumstances, such as where a movant raises new arguments or facts in a reply brief, or where a party wishes to inform the Court of a new decision or rule implicating the motion under review. Cf., e.g., Fredrick, 366 F. Supp. 2d at 1197 (stating "valid reason for . . . additional briefing exists . . . where the movant raises new arguments in its reply brief"). In this case, Defendants' reply brief directly addresses arguments raised by Plaintiff in its opposition to

Defendants' motions for summary judgment. Accordingly, a surreply is not warranted and Plaintiff's Motion for Leave to File Surreply [274] is **DENIED**.

## Background

This case involves trademark infringement and false advertising claims arising out of the parties' manufacture and sale of intermediate bulk containers (IBCs). IBCs are used for the storage and transport of goods, both hazardous and non-hazardous. They consist of two major components: an outer cage and an inner bottle. The outer cage is attached to a pallet and may be made of metal, wood, or plastic. (Minnich Decl., Dkt. [198] ¶ 3.) Inside the cage is a "cube-like" plastic bottle designed to hold between 170 and 330 gallons of material. (Id.) The bottle sits on the pallet and is supported by the cage, "which helps to ensure that the filled bottle retains its form and to protect the bottle from impacts or contact with other containers during storage and transport." (Id.)

## I.     The Parties and their Products

Since its inception in 1990, Plaintiff Schütz Container Systems, Inc. ("Plaintiff" or "Schütz") has been the leading seller of IBCs in the United States market. (Pl.'s Consolidated Statement of Additional Facts in Resp. Defs.

Mauser & NCG's Mots. for Summ. J. on Pl.'s Claims ("Pl.'s Consolidated SAF"), Dkt. [230] ¶ 8, 11; Defs.' Mauser & NCG's Resps. to Pl.'s Consolidated SAF, Dkt. [257] ¶ 11.) Schütz manufactures and sells new IBCs, which consist of newly-manufactured Schütz metal cages and newly-manufactured Schütz bottles made of high density polyethylene ("HDPE"). (Pl.'s Mot. for Summ. J. on Def. NCG's Counterclaims ("Pl.'s Mot. for Summ. J."), Dkt. [194] at 4 of 29; Pl.'s App'x of Excerpts & Materials in Supp. Pl.'s Mot. for Summ. J. ("Pl.'s App'x in Supp. Mot. for Summ. J."), Dkt. [195] Tab D, 12/16/2010 Dep. Brian Minnich, at 214:2-5.) The plastic bottle is approximately flat on all four sides and designed to fit the Schütz cage. (Minnich Decl., Dkt. [198] ¶¶ 4-5.)

    In addition to selling new IBCs, Schütz also sells used IBCs–IBCs that have been used at least once, returned to Schütz, and reconditioned by Schütz for further use. (Pl.'s App'x in Supp. Mot. for Summ. J., Dkt. [195] Tab D, 12/16/2010 Dep. Brian Minnich, at 214:19-24.) Reconditioning can occur in one of two ways: "washing" or "rebottling." If the IBC simply is "washed," the original cage and bottle are retained but cleaned and reconditioned for further use. (Id. Tab E, 2/16/2011 Dep. of Fredrik Wenzel, at 19:20-25.) If the IBC is "rebottled," the plastic inner bottle is removed from the original cage and

AO 72A
(Rev.8/82)

replaced.  (Id. at 20:3-21:9.)  Since its inception in 1990, Schütz has been the

exclusive manufacturer and source of original Schütz IBCs and has marketed

and sold all of its products under the "Schütz" brand name.  (Pl.'s Consolidated

SAF, Dkt. [230] ¶¶ 9, 12.)  The outer cages and inner bottles of Schütz IBCs

thus are both marked "Schütz."  (Id. ¶ 13.)

     Defendants Mauser Corporation ("Mauser") and National Container

Group, LLC ("NCG") ("Defendants") are affiliated entities and competitors of

Schütz in the IBC market.  (Defs. Mauser & NCG's Statement of Undisputed

Material Facts in Supp. Mot. for Summ. J. on Pl.'s Trademark Claims (Counts

II, IV-VI) ("Defs.' Trademark Mot. for Summ. J.") ("Defs.' Trademark SMF"),

Dkt. [214] ¶ 9; Pl. Schütz's Consolidated SAF, Dkt. [230] ¶ 1.)  Mauser, like

Schütz, manufactures and sells new IBCs.  (Defs.' Trademark SMF, Dkt. [214]

¶¶ 7-8.)  The Mauser IBC consists of a Mauser outer cage and Mauser inner

bottle, the latter of which is designed to fit the Mauser cage.  (Pl.'s App'x in

Supp. Mot. for Summ. J., Dkt. [195] Tab H, 12/2/2010 Dep. T.J. Janowski, Ex.

110 at 2.)  Unlike the Schütz bottle, which is approximately flat on all four

sides, the Mauser bottle has indentations on its four side walls.  (Pl.'s

Consolidated SAF, Dkt. [230] ¶ 89.)  These indentations line up with the bars of the Mauser cage but do not line up with the bars of the Schütz cage.  (Id. ¶ 89.)

NCG does not manufacture new IBCs but rather is in the business of reconditioning IBCs.  (Defs.' Trademark SMF, Dkt. [214] ¶¶ 10-12.)  It is one of the largest–if not the largest–reconditioners in the IBC industry.  (Id. ¶ 12.)  NCG obtains used IBCs on the open market and then washes or rebottles them, prior to selling them again on the open market.  (Id. ¶ 11.)  The conduct that forms the basis of the parties' claims in this case is the practice of "cross-bottling."  "Cross-bottling" occurs when an IBC reconditioner removes the plastic bottle of a used IBC and replaces that bottle with one manufactured by an entity other than the original manufacturer (i.e., by a non-"original equipment manufacturer" (non-"OEM")).  (Id. ¶ 16.)  For example, if a reconditioner were to buy a used Schütz IBC on the open market, remove the Schütz bottle, and replace it with a Mauser bottle, the reconditioned IBC would be called "cross-bottled."  In other words, a "cross-bottled" IBC is "an IBC comprised of a used outer cage from one manufacturer and a new inner bottle from another manufacturer."  (Id.)

AO 72A
(Rev.8/82)

NCG is the largest cross-bottler in the United States. (Pl.'s Consolidated SAF, Dkt. [230] ¶ 31.) Because it is owned by Mauser, NCG has access to a steady supply of Mauser bottles and therefore generally cross-bottles using the Mauser bottle. (Pl.'s App'x in Supp. Mot. for Summ. J., Dkt. [196] Tab L, 1/28/2011 Dep. of John Smyth, at 56:13-23; Pl.'s Conslidated SAF, Dkt. [230] ¶ 15.) Additionally, NCG almost always cross-bottles using a Schütz outer cage: "[t]he cross-bottled units that NCG sells almost always consist of a Schütz cage and a Mauser bottle." (Pl.'s Consolidated SAF, Dkt. [230] ¶ 33.) When NCG cross-bottles, it does not remove the "Schütz" name from the used outer cage. (Defs.' Trademark SMF, Dkt. [214] ¶ 17.) This Schütz/ Mauser cross-bottled IBC is the product at issue in this case.

## II.    Regulation of IBCs

Most of the following "facts" regarding the regulation of IBCs come from Plaintiff's brief in support of its motion for summary judgment, which facts Plaintiff provides only for "background and context." (Pl.'s Mot. for Summ. J., Dkt. [194] at 2 n.1 of 29.) Contrary to the requirements of Local Rule 56.1(B)(2), Plaintiff asserted these purported facts only in its brief and did not include them in its statement of undisputed material facts. Furthermore,

Plaintiff states in its brief that these "background" facts are not material to its motion. (Pl.'s Mot. for Summ. J., Dkt. [194] at 2 n.1 of 29.)

Under Local Rule 56.1(B)(1)(d), the Court is not to consider facts raised outside of the Rule 56.1 statement. Defendant NCG, however, in an abundance of caution, has responded to each of these facts. The Court also finds these "facts"–although not essential to resolving Plaintiffs' motion–helpful in understanding the parties' arguments and legal positions. Accordingly, to the extent NCG has responded to and does not dispute the facts raised only in Plaintiff's brief, and to the extent they help the Court understand the parties' arguments, they are repeated here.[1]

As stated above, IBCs may be used to transport both hazardous and non-hazardous goods. If an IBC is intended to transport hazardous goods in the United States, the manufacturer must have the IBC "design type tested" in accordance with United States Department of Transportation ("USDOT") regulations. (NCG's Resps. to Pl.'s Facts in Supp. Mot. for Summ. J., Dkt.

---

[1] Because NCG has enumerated and responded to each of these facts, the Court cites to them as they appear in NCG's "Responses to Counterclaim-Def. Schütz's Rule 56.1 Statement of Undisputed Material Facts in Supp. Mot. for Summ. J. & to Statements of Fact Set Forth Only in Counterclaim-Def.'s Br." (Dkt. [242]) (hereinafter "NCG's Resps. to Pl.'s Facts in Supp. Mot. for Summ. J.").

[242] ¶¶ 33, 35.)  The USDOT regulations are modeled after United Nations

("UN") regulations on the transport of hazardous goods.  (Id. ¶ 34.)  IBCs that

will not transport hazardous goods are not subject to these regulations.  (Id. ¶

36.)  The governing regulations require IBCs used in the transport of hazardous

material to be labeled with a "UN String," which is used to certify compliance

with the regulations.  (Id. ¶ 37-38.)  The UN String contains various

information, including a code indicating the entity that is certifying compliance.

(Id. ¶ 38.)  Each of Schütz's IBC design types is subject annually to

UN/USDOT design certification testing.  (Id. ¶ 39.)  The regulations are also

applicable to cross-bottled IBCs.  (Pl.'s Consolidated SAF, Dkt. [230] ¶ 76.)

Indeed, Defendants' cross-bottled IBC comprised of a Schütz cage and Mauser

bottle has been certified for the transport of hazardous goods in accordance with

these regulations.  (Def. NCG's Statement of Additional Material Facts in

Opp'n Pl. Schütz's Mot. for Summ. J. ("NCG's SAF in Opp'n Schütz's Mot.

for Summ. J."), Dkt. [241] ¶ 9.)

IV.    **Schütz's Position on Cross-Bottling**

       Schütz is a staunch critic of the practice of cross-bottling, generally, and

of NCG's cross-bottling using a Schütz cage, in particular, summing up its

9

views on the issue as follows: "retention of the SCHÜTZ mark on an IBC not manufactured, tested or sold by Schütz confuses consumers, harms the Schütz brand, poses unclear liabilities, and is an extreme and unacceptable risk to consumers." (Pl.'s Mot. for Summ. J., Dkt. [194] at 10 of 29.) Schütz argues that the practice of cross-bottling adversely affects original manufacturers and the overall IBC industry in several ways. (Id.) First, Schütz contends that cross-bottlers often do not remove original UN certificates–which designate the original manufacturer as the entity responsible for the IBC's performance–prior to selling the remanufactured product. (Id. at 10-12 of 29.) Thus, Schütz contends, cross-bottling creates a danger that performance failures of a cross-bottled IBC will be attributed falsely to the original manufacturer. (Id. at 11 of 29.)

Second, Schütz argues that cross-bottling creates confusion among customers as to the source of the IBC and thus the entity they should contact for service or information. (Id. at 12-13 of 29.) Finally, Schütz argues that cross-bottled IBCs are subject to less testing, do not perform as well, and are of lower quality than non-cross-bottled IBCs. (Id. at 13-14 of 29.) Schütz has expressed its critical views of cross-bottling to IBC trade associations and regulatory

10

agencies.  (<u>Id.</u> at 19-21 of 29.)  These views form the backdrop of Plaintiff's claims in this case.

## V.     The Parties' Claims

Schütz filed this action against Defendants Mauser and NCG on December 23, 2009, raising claims for trademark infringement and false advertising under both state and federal law, as well for unjust enrichment, stemming from Defendants' cross-bottling using the Schütz cage.[2]  (Compl., Dkt. [1].)  As discussed in detail <u>infra</u>, Schütz accuses Defendants of trademark infringement under federal and state law, based on Defendants' retention of the Schütz mark on their cross-bottled products (Counts II, IV-VI).  Schütz also accuses Defendants of false advertising under federal and state law, based on this use of the Schütz mark and on statements made by Defendants, which Schütz contends falsely equate the quality and performance of cross-bottled products to that of a Schütz IBC (Counts III-VI).  Finally, Schütz contends that Defendants have been unjustly enriched as a result of this alleged wrongdoing (Count VII).

_____

[2] Plaintiff's Complaint originally included a claim for patent infringement (Count I), which was dismissed by order of this Court on July 9, 2010.  (Dkt. [56].)

AO 72A
(Rev.8/82)

On December 10, 2010, Defendant NCG amended its original Answer, Affirmative Defenses, and Counterclaims (Dkt. [60]) to assert claims against Schütz for false advertising under federal law (Fourth Counterclaim) and, relatedly, for product disparagement under state law (Fifth Counterclaim). (Dkt. [101].) These claims are based on various statements made by Schütz impugning cross-bottled IBCs. The parties now move for summary judgment on the claims of their respective opponents. After setting out the governing legal standard, the Court considers each motion in turn.

## Discussion

## I.     Motion for Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259

(11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

13

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

Utilizing this framework, the Court considers, in turn, Plaintiff Schütz's Motion for Summary Judgment on Defendant NCG's Counterclaims ("Schütz's Motion for Summary Judgment") [184] and Defendant Mauser and NCG's Motions for Summary Judgment on Plaintiff Schütz's Trademark Claims ("Defendants' Trademark Motion for Summary Judgment") [187] and False Advertising and Unjust Enrichment Claims ("Defendants' False Advertising and Unjust Enrichment Motion for Summary Judgment") [188].

## II.    Schütz Container Systems, Inc.'s Motion for Summary Judgment on Defendant National Container Group, LLC's Counterclaims [184]

Plaintiff Schütz moves for summary judgment on Defendant NCG's Fourth and Fifth Counterclaims, which raise, respectively, claims for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and for product disparagement under Georgia's Uniform Deceptive Trade

Practices Act ("UDTPA"), O.C.G.A. § 10-1-372(a)(8).  (Defs. Mauser &

NCG's First Am. Answer, Affirmative Defenses, & Counterclaims ("Defs.'

Am. Counterclaims"), Dkt. [106] at 31-33 of 38, ¶¶ 34-45.)  Both counterclaims

stem from statements made by Schütz in reference to the cross-bottling

business.  In particular, NCG identifies nineteen (19) statements made by

Schütz that allegedly constitute false advertising (actionable under the Lanham

Act) and/or product disparagement (actionable under Georgia's UDTPA).[3]

(Counterclaim-Pl. NCG's Br. in Opp'n to Counterclaim-Def. Schütz's Mot. for

Summ. J. on NCG's Counterclaims ("NCG's Opp'n"), Dkt. [240] at 11 of 29.)

The Court considers Schütz's Motion for Summary Judgment first as to the

Lanham Act counterclaim and then as to the UDTPA counterclaim.

A.    NCG's Lanham Act Fourth Counterclaim

In its Fourth Counterclaim, NCG alleges that Schütz has engaged in false

advertising in violation of Section 43(a) of the Lanham Act, which prohibits the

---

[3] Citing its First Amended Answer, Affirmative Defenses and Counterclaims
and response to Schütz's Interrogatory number 23, NCG states that it originally
identified twenty-six (26) statements as actionable under the Lanham Act and/or
UDTPA.  (Counterclaim-Pl. NCG's Br. in Opp'n to Counterclaim-Def. Schütz's Mot.
for Summ. J. on NCG's Counterclaims ("NCG's Opp'n"), Dkt. [240] at 7.)  NCG has
withdrawn statements 20-26, however, leaving nineteen (19) accused statements.  (Id.)

use of any "false or misleading description of fact . . . which in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of . . . another persons's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). NCG alleges, specifically, that Schütz has made false representations of fact concerning the cross-bottling business, with the purpose and effect of influencing purchasers and customers not to buy cross-bottled IBCs from NCG, thereby damaging NCG's reputation and shifting customers away from it and in favor of Schütz. (Defs.' Am. Counterclaims, Dkt. [106] at 32 of 38, ¶¶ 36-37.)

Of the nineteen total accused statements referenced above, NCG identifies Statements 1-5[4] as being actionable under the Lanham Act as "literally false."[5] (NCG's Opp'n, Dkt. [240] at 12-13 of 29.) These statements

---

[4] The Court refers to the accused statements as "Statement [number]," for example, "Statement 1" or "Statement 18." The statement numbering comes from NCG's Opposition Brief and Exhibit thereto. (Dkt. [240], [240-1]).

[5] NCG concedes that statements 6-19 are not actionable under the Lanham Act because they were not made to consumers. (NCG's Opp'n, Dkt. [240] at 25-26 of 29.) As the plain language of the Act provides, the Lanham Act applies only to false or misleading statements contained in "commercial advertising or promotion" disseminated to consumers. (See discussion and footnote 6, infra.) Accordingly, Schütz is entitled to summary judgment on the Lanham Act Fourth Counterclaim to the extent the Counterclaim is based on Statements 6-19.

16

read as follows:

1. "[T]he use of non-OEM parts for certain components means that the entire system can no longer be considered tested and approved: the results of interaction between original and non-OEM components are unknown."

2. "The system cannot be considered as 'tested and proven' if certain components are non-OEM."

3. "Interactions of original and non-OEM components are unknown!"

4. "Unclear legal, liability, and warranty questions."

5. "With using non-OEM parts for certain components, the whole systems [sic] cannot be considered any longer to be tested and proven: Interactions of original and non-OEM components are unknown!"

(NCG's Opp'n, Dkt. [240] at 12-13 of 29; NCG's Opp'n Ex. 1, Dkt. [240-1] at 3 of 10.)

To prevail on a Lanham Act false advertising claim, the claimant must ultimately prove that "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the

17

movant has been–or is likely to be–injured as a result of the false advertising."[6]
Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242,
1247 (11th Cir. 2002) (citation omitted).  Accordingly, if the claimant fails to
make a showing sufficient to establish the existence of any one of these
essential elements, summary judgment properly may be granted against him.
See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986):

> The plain language of [Rule 56] mandates the entry of summary
> judgment, after adequate time for discovery and upon motion,
> against a party who fails to make a showing sufficient to establish
> the existence of an element essential to that party's case, and on
> which that party will bear the burden of proof at trial.  In such a
> situation, there can be "no genuine issue as to any material fact,"
> since a complete failure of proof concerning an essential element
> of the nonmoving party's case necessarily renders all other facts
> immaterial.  The moving party is "entitled to judgment as a matter
> of law" because the nonmoving party has failed to make a
> sufficient showing on an essential element of her case with respect
> to which she has the burden of proof.

In this case, Schütz moves for summary judgment on the Lanham Act

counterclaim on grounds that NCG has failed to establish the first essential

---

[6] As is clear from the statutory text of Section 43(a) and the aforementioned
elements of the claim, a claimant has the threshold burden of showing that the
allegedly false or misleading statements were made in "commercial advertising or
promotion."  15 U.S.C. § 1125(a)(1)(B).

AO 72A
(Rev.8/82)

element of the claim—falsity.[7]  (Schütz's Mot. for Summ. J., Dkt. [194] at 21-23

of 29.)  Schütz argues that the undisputed evidence shows that Statements 1-3

and 5 are not actionable because they are true, and that Statement 4 is not

actionable because it is a statement of opinion that cannot be classified as false.[8]

(Id.)  The Court considers these contentions in turn.

> 1.    *Falsity of Statements 1-3 and 5*

When determining whether a statement is literally false, courts "must

analyze the message conveyed in full context" and "view the face of the

statement in its entirety . . . ."  Osmose, Inc. v. Viance, LLC, 612 F.3d 1298,

1308 (11th Cir. 2010) (internal quotation marks and citation omitted).  If the

meaning of the challenged statement is ambiguous, it may not be classified as

literally false.  Id. at 1309 ("Statements that have an unambiguous meaning,

---

[7] As the language of Section 43(a) demonstrates, a statement need not be
literally false to be actionable under the Lanham Act; on the contrary, a statement may
be actionable if it is "literally true, but misleading."  Johnson & Johnson Vision Care,
Inc., 299 F.3d at 1247; 15 U.S.C. § 1125(a)(1)(B) (referring to "false or misleading"
statements).  Because NCG contends only that Statements 1-5 are "literally false"
(NCG's Opp'n, Dkt. [240] at 8), if the Court finds insufficient evidence from which a
reasonable jury could find them to be false, summary judgment must be granted in
Schütz's favor.

[8] In the alternative, Schütz argues that Statement 4 is true.  (Schütz's Mot. for
Summ. J., Dkt. [194] at 22.)

either facially or considered in context, may be classified as literally false. . . . '[I]f the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false.'") (quoting Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 158 (2d Cir. 2007)).  See also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 587 (3d Cir. 2002) ("[O]nly an unambiguous message can be literally false."); Zoller Labs., LLC v. NBTY, Inc., 111 F. App'x 978, 983-84 (10th Cir. 2004) (same).

The Court thus undertakes to determine–viewing the evidence and the reasonable inferences therefrom in the light most favorable to NCG–whether there is an issue of material fact as to whether Statements 1-3 and 5 are literally false.  If there is no such issue and the undisputed evidence shows that the Statements are not false, then Schütz is entitled to judgment as a matter of law. If, on the other hand, there is a genuine factual dispute as to whether the Statements are false (such that a reasonable jury could find the Statements to be false), Schütz's motion for summary judgment must be denied.

Statements 1-3 and 5 each pertain to the test-ability of cross-bottled IBCs.  The Court sets out the context of each Statement before considering

20

whether a reasonable jury could find the Statements to be false.

### a.   Accused Statements in Context

*Statement 1*: *"[T]he use of non-OEM parts for certain components means that the entire system can no longer be considered tested and approved: the results of interaction between original and non-OEM components are unknown."*

Statement 1 appears on a page of Schütz's website entitled "Originality makes for safety."  (Counterclaim-Pl. NCG's Statement of Additional Material Facts in Opp'n to Counterclaim-Def. Schütz's Mot. for Summ. J. on NCG's Counterclaims ("NCG's Statement of Additional Facts (SAF)"), Dkt. [241] ¶ 26 & Ex. S.)[9]  Placing Statement 1 in context, the website page reads, in full, as follows:

**Originality makes for safety.**

SCHÜTZ has decades of experience in the development, production and use of IBCs, including the full life cycle of which reconditioning is an element.  SCHÜTZ ECOBULKs and reconditioning through the SCHÜTZ TICKET SERVICE therefore form a co-ordinated, closed-loop system.

_____

[9] The Court notes that NCG, apparently by mistake, re-docketed its brief in opposition to Schütz's Motion for Summary Judgment as its Statement of Additional Material Facts.  (See Dkt. [241].)  NCG also failed to file on the docket Exhibits A-HH cited in its opposition brief.  (See Dkt. [241-1], attaching only Exhibits II-YY.)  Because NCG delivered courtesy copies to the Court, the Court was able to refer to these materials.

All components are developed and tested with regard to their interaction throughout the system [sic]

There are practically no components that are not "safety-relevant" [sic]

For this reason, we take a critical view of cross-bottling and similar activities because *the use of non-OEM parts for certain components means that the entire system can no longer be considered tested and approved:* **the results of interaction between original and non-OEM components are unknown**.

(Id. (bold in original) (italics added to identify accused statement).)

>*Statement 2:* "The system cannot be considered as 'tested and proven' if certain components are non-OEM."

>*Statement 3:* "Interactions of original and non-OEM components are unknown!"

Statements 2 and 3 appear in a Schütz PowerPoint presentation entitled "IBC Handling Guide," in a chapter entitled "Reconditioning and Originality." (Id. ¶ 28, Ex. SS.)  In his March 4, 2011 deposition, Schütz designee Brian Minnich testified that the purpose of the IBC Handling Guide is to provide "general background to Schütz and the IBC."  (NCG's SAF, Dkt. [241] Ex. G, 3/4/11 30(b)(6) Dep. of B. Minnich, at 761:12-14.)  In response to a question from NCG's counsel regarding whether the presentation is also intended to

22

"dissuade potential customers from purchasing cross-bottled IBCs," Mr.

Minnich replied, "It lists concerns about cross-bottling, yes." (Id. at 761:16-

21.)

The presentation's table of contents, entitled "Chapters," lists twelve

chapters of the presentation, which are further divided into two topical

groups–"Product Information" and "Operating Information." (NCG's SAF,

Dkt. [241] Ex. SS.) The titles of the twelve chapters are as follows: (1) Product

Description, (2) Components, (3) Reconditioning and Originality, (4)

Performance and Tests, (5) Labels, (6) General Use and Installation

Instructions, (7) Use With Hazardous Goods, (8) Storage, (9) Handling, (10)

Filling Operations, (11) Emptying Operations, and (12) Use of Valves. (Id.)

As stated above, accused Statements 2 and 3 appear in Chapter (3),

"Reconditioning and Originality," on the third of four slides, which slides read

as follows:

[SLIDE 1]

**Reconditioning & Originality**

• SCHÜTZ TICKET SERVICE has set the benchmark for the
economical, ecological and safe reconditioning of used ECOBULK
containers:

- There are plenty of good reasons for using SCHÜTZ TICKET SERVICE

- There are numerous good reasons against cross-bottling and non-authorised reconditioning

[SLIDE 2]

**Reconditioning & Originality**

**Good reasons for SCHÜTZ TICKET SERVICE**

- SCHÜTZ has decades of experience with the ECOBULK system comprising the complete life cycle including reconditioning operations

- ECOBULK containers are complex systems:

  - All components are designed and tested with regard to their interactions in the complete system

  - There are virtually no "non-safety relevant" components

- The complete containers are tested in various ways to guarantee full product safety and to "earn" the UN approval for the transportation of hazardous goods

[SLIDE 3]

**Reconditioning & Originality**

**Good reasons against cross-bottling and similar activities**

- *The system cannot be considered as "tested and proven" if certain*

AO 72A
(Rev.8/82)

*components are non-OEM:*

- ***Interactions of original and non-OEM components are unknown!***

- **Unclear legal, liability and warranty questions:**
  - Who is to blame, who is to be contacted?

- **Unclear legal and safety issues:**
  - Does the non-OEM replacement part conform with regulations?
  - Is the initial approval for the container still valid?

[SLIDE 4]

**Reconditioning & Originality**

**Enhanced Originality Protection**

- To prevent the misuse of ECOBULK containers and the SCHÜTZ trademark especially regarding reconditioning, SCHÜTZ marks every component with the SCHÜTZ logo.

(<u>Id.</u> (bold in original) (italics added to identify accused statements).)

> *Statement 5: "With using non-OEM parts for certain components, the whole systems cannot be considered any longer to be tested and proven: Interactions of original and non-OEM components are unknown!"*

Statement 5 is contained in another Schütz PowerPoint presentation

entitled "Reconditioning - Originality," on a slide entitled "Good reasons

against cross-bottling and similar activities." (<u>Id.</u> ¶ 33, Ex. TT.)  This

25

presentation is the same, in all material respects, as Chapter (3)

("Reconditioning & Originality") of the IBC Handling Guide, discussed above.

**b.    Analysis**

Statements 1-3 and 5 each make one or both of the following claims:

first, that an IBC with a non-OEM part "cannot be considered tested and

proven," or second, that the results of interaction between original and non-

OEM parts in an IBC "are unknown."  NCG argues that the undisputed

evidence shows these statements to be false–i.e., that cross-bottled IBCs can be

considered "tested and proven" and therefore that the interaction between

original and non-OEM parts is "known."  (NCG's Opp'n, Dkt. [240] at 14-20 of

29.)  In support of this argument, NCG points to the fact that its cross-bottled

IBCs have been tested and certified for the transport of hazardous materials in

accordance with U.N. regulations.  (NCG's SAF, Dkt. [241] ¶¶ 9, Ex J, 11/4/10

Dep. of Michael Porreca, as designee of NCG, at 211: 9-13.)  Furthermore,

NCG points to the fact that Schütz has admitted, "If a cross-bottled IBC passes

a design qualification test, it has been tested and approved for the transport of

dangerous goods under DOT regulations and U.N. model regulations[.]"  (Id. ¶

15, Ex. G, 3/4/11 30(b)(6) Dep. of B. Minnich, at 708:23-709:3.)  In sum, NCG

26

argues as follows: "Simply put, NCG's cross-bottled IBCs can be–and are–tested and approved, and the interactions between OEM Schütz cages and non-OEM Mauser bottles is known. Thus by its own admission, Schütz's advertisements to the contrary are false." (NCG Opp'n, Dkt. [240] at 15 of 29.)

In support of its claim that each of these statements is literally true, Schütz makes the following arguments: First, Schütz argues that the undisputed evidence shows that the IBC industry as a whole "has been concerned about incidents of 'rogue' or improper cross-bottling for years." (Schütz's Mot. for Summ. J., Dkt. [194] at 21 of 29.) Second, Schütz argues that cross-bottled IBCs do not undergo the same testing and quality control measures as those to which wholly-Schütz manufactured IBCs are subjected. (Id.) Third, Schütz contends that NCG sells non-UN/USDOT certified cross-bottled IBCs. (Id. at 22 of 29.) And finally, Schütz argues the statements are true because until the year 2010, neither NCG nor the industry, generally, collected data regarding the performance of cross-bottled IBCs. (Id.)

Having examined the Statements in their context and considered the arguments of the parties, the Court concludes that Statements 1-3 and 5 cannot be found to be "literally false" because they are ambiguous. Before explaining

this conclusion, the Court first notes that most of Schütz's arguments regarding the alleged truth of the Statements were irrelevant and unpersuasive. For example, even if–as Schütz contends–the uncontroverted evidence demonstrates industry-wide concern over cross-bottling or that certain NCG cross-bottled IBCs are not UN/USDOT certified, these facts would not prove that cross-bottled IBCs, in the absolute, cannot be considered tested and proven, or that the interaction between original and non-OEM parts is absolutely unknown. On the contrary, as NCG argues, the fact that NCG has UN/USDOT certified cross-bottled IBCs disproves the notion that no cross-bottled IBC can ever be considered tested or proven; as a logical corollary, since cross-bottled IBCs can be UN/USDOT certified, i.e., tested and proven, it cannot be said that the interaction of original and non-OEM components is unknown.

Schütz also argues, however, that the accused statements are true because cross-bottled IBCs are not subjected to *Schütz's* internal testing and quality control protocols. Therefore, the argument presumably goes, from the standpoint of Schütz, cross-bottled IBCs are not tested and approved and the interaction between original and non-OEM parts is unknown. It is this

argument that convinces the Court that Statements 1-3 and 5 are ambiguous and therefore not false.

The Court reaches this conclusion despite NCG's argument to the contrary. According to NCG, the accused statements unambiguously assert that cross-bottled IBCs, as an absolute matter, cannot be considered tested and approved for use in the IBC industry (and that the interactions between original and non-OEM parts are unknown from an industry standpoint). NCG argues that the Statements cannot be read as referring only to Schütz's own internal testing procedures because the Statements themselves never reference those procedures. (NCG Opp'n, Dkt. [240] at 17 of 29.) The Court, however, disagrees. Considering them in their context, a reasonable jury could understand the meaning of the Statements to be that cross-bottled IBCs cannot be considered tested and proven according to Schütz's testing protocols (and the interaction between original and non-OEM parts unknown with respect to those protocols).

As set forth in detail above, each statement appears in the context of a broader discussion of the process by which Schütz designs and tests each component of its IBCs, with specific attention to how those components interact

29

with one another, and reconditions them through the SCHÜTZ TICKET

SERVICE.  Given their context, a reasonable jury could find accused

Statements 1-3 and 5 to mean that because cross-bottled IBCs are not subjected

to that process, they are not tested or proven, or the interaction between their

original and non-OEM parts known, from Schütz's perspective.  Accordingly,

because the statements reasonably are susceptible to this alternate interpretation,

they are ambiguous and cannot be found to be "literally false."  Plaintiff thus is

entitled to summary judgment on NCG's Lanham Act Fourth Counterclaim

based on accused Statements 1-3 and 5.

>    2.    *Actionability of Statement 4*

Schütz moves for summary judgment as to Statement 4 on grounds that

Statement 4 is a non-actionable statement of opinion (and, alternatively,

because it is not literally false).  "Statements of opinion are generally not

actionable [under the Lanham Act]."  <u>Osmose</u>, 612 F.3d at 1311.  A statement

of opinion may be actionable, however, if it "impl[ies] the existence of facts

that justify the opinion. . . ."  <u>Id.</u> (quoting Restatement of Unfair Competition §

3 cmt. d (1995)).

Statement 4 appears in the IBC Handling Guide, along with Statements 2 and 3, as a sub-bullet point on one of the four slides of Chapter (3), "Reconditioning & Originality." (NCG SAF, Dkt. [241] Ex. SS.) The Statement provides, "Unclear legal, liability and warranty questions:[,]" under which the question is posed, "Who is to blame, who is to be contacted?" (Id.) The Court agrees with Schütz that this statement is a non-actionable statement of opinion, as the statement cannot be proved or disproved based on identifiable facts, but rather concerns an issue as to which reasonable minds may differ. Cf. Moulton v. VC3, No. 1:00-cv-434-TWT, 2000 WL 33310901, at *3 (N.D. Ga. Nov. 7, 2000) (finding in context of defamation suit statement that defendant's employees were "stupid" to be non-actionable opinion, reasoning, "Statements about which reasonable people might differ, . . . and which cannot be proved to be true or false, are [non-actionable opinion].").

NCG contends that Statement 4 is not a statement of opinion but rather a "literally false" statement of fact. In support of this contention, NCG points to the existence of UN/USDOT regulations, which NCG contends govern the legal and liability issues surrounding cross-bottled IBCs, thus making those issues clear. (NCG Opp'n, Dkt. [240] at 21 of 29.) According to NCG, the applicable

31

regulations "provide that the testing and remanufacturing of cross-bottled IBCs is the responsibility of the remanufacturer–*not* the components' manufacturer." (NCG Opp'n, Dkt. [240] at 21 of 29.)

The Court finds NCG's argument unavailing. Although regulations on cross-bottled IBCs appear to exist, NCG fails to show that the regulations make legal, liability, and warranty questions absolutely clear as a factual matter. Indeed, as any observer of the legal system knows, the existence of a law on point does not end all controversy or confusion regarding the issue it governs. In other words, while a regulation may exist, reasonable minds can still differ as to the regulation's meaning, scope, or, as in this case, clarity. In sum, because it is a statement of opinion that cannot be classified as literally false, Plaintiff Schütz is entitled to summary judgment on Defendants' Lanham Act Fourth Counterclaim to the extent it is based on Statement 4.

Based on the foregoing, the Court finds that none of Statements 1-5 is actionable as false advertising under the Lanham Act. Accordingly, Schütz's Motion for Summary Judgment on NCG's Lanham Act Fourth Counterclaim is **GRANTED**.

AO 72A
(Rev.8/82)

B.    UDTPA Fifth Counterclaim

In its Fifth Counterclaim, NCG alleges that all nineteen accused statements are actionable as product disparagement under Georgia's UDTPA, O.C.G.A. § 10-1-327 et seq. (NCG Opp'n, Dkt. [240] at 25 of 29), which provides as follows: "A person engages in a deceptive trade practice when, *in the course of his business, vocation, or occupation*, he . . . [d]isparages the goods, services, or business of another by false or misleading misrepresentation of fact[.]"  O.C.G.A. § 10-1-372(a)(8) (emphasis added).  Schütz moves for summary judgment on this counterclaim on grounds that Statements 1-5 are not false and Statements 6-19 were not distributed to customers and are privileged. (Schütz's Mot. for Summ. J., Dkt. [194] at 19-21, 21-24, 25-26 of 29.)

Based on the Court's ruling in Part II.A., supra, finding Statements 1-5 to be ambiguous and therefore not literally false, Statements 1-5 cannot give rise to liability under the UDTPA, which, like the Lanham Act, prohibits only "false or misleading" misrepresentations of fact.[10]  Accordingly, Plaintiff's motion for

---

[10] As stated above, NCG contends only that the accused statements are "literally false," not misleading.

33

summary judgment on NCG's UDTPA counterclaim is **GRANTED** to the extent it is based on accused Statements 1-5.

With regard to Statements 6-19, NCG argues that Plaintiff's motion should be denied because unlike under the Lanham Act, a statement need not be disseminated to customers to give rise to liability under the product disparagement provision of the UDTPA. (NCG's Opp'n, Dkt. [240] at 25-26 of 29.) That is, this provision does not require that a false statement be made in a "commercial advertising or promotion" but rather only that it be published. (Id. at 26 of 29.) In support of this argument, NCG points to the statutory text of O.C.G.A. § 10-1-372(a)(8), which does not have the same "commercial advertising or promotion" limitation that is found in the Lanham Act. (Id.)

The Court agrees with Defendants and finds that an accused statement need not have been disseminated to customers so as to constitute "commercial advertising or promotion," as is required under the Lanham Act, to be actionable under the product disparagement provision of Georgia's UDTPA. The statutory text has no such limitation, and Plaintiff has not directed the

Court to any Georgia authority finding one.[11]  On the contrary, the case law

appears to supports NCG's argument that causes of action arising under

O.C.G.A. § 10-1-372(a)(8) are considered according to traditional defamation

principles, according to which a statement need only have been "published" to

be actionable.

For example, in Sweeney v. Athens Regional Medical Center, the

plaintiff brought a claim under O.C.G.A. § 10-1-372(a)(8) against a physician

based on statements the latter made at a hospital nurses' station disparaging the

---

[11] The cases cited by Plaintiff in support of its argument that the Lanham Act's "commercial advertising or promotion" requirement applies equally to claims under the UDTPA are inapplicable, as each case concerns the UDTPA's false advertising provision, O.C.G.A. § 10-1-372(a)(2), rather than its provision governing product disparagement.  Section 10-1-372(a)(2) is worded almost identically to the Lanham Act and indeed is analyzed in the same way as a Lanham Act false advertising claim. See Section 10-1-372(a)(2) (including in definition of "deceptive trade practice" conduct that "[c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods of services"); see also Kason Indus., Inc. v. Component Hardware Group, Inc., 120 F.3d 1199, 1203 & 1203 n.6 (11th Cir. 1997) ("It should be apparent that § 43(a) of the Lanham Act and § 10-1-372(a)(2) of the UDTPA provide analogous causes of action governed by the same standard.  The similarity of the two statutes is further evidenced by Georgia plaintiffs, who often bring claims for trademark . . . protection under both the Lanham Act and the UDTPA.").  Indeed, Plaintiff in this case brings false advertising claims against Defendants both under the Lanham Act and the UDTPA.  Defendants do not dispute that these claims are governed by the same legal standard.  (Defs.' False Advertising & Unjust Enrichment Mot. for Summ. J., Dkt. [215] at 8 n.1 of 39.)

35

plaintiff's work as a midwife.[12]  709 F. Supp. 1563 (M.D. Ga. 1989).  Although

these statements–made in the presence of nurses, medical students, and some

hospital patients–undoubtedly would not qualify as "commercial advertising or

promotion" under the Lanham Act, the court denied the defendant physician's

motion for summary judgment on grounds that there was sufficient evidence to

satisfy the statutory prerequisite to recovery–that the disparaging statements

were made by the defendant "in the course of her business, vocation, or

occupation."[13]  Id. at 1582.

---

[12] Plaintiff also brought a claim for libel based on the same accused statements. Id. The fact that Georgia plaintiffs appear often to bring claims for defamation alongside their Section 10-1-372(a)(8) claims reinforces the Court's conclusion that traditional defamation principles (and its "publication" requirement) govern the analysis of this claim.  See also Dominy v. Shumpert, 510 S.E.2d 81, 86 (Ga. Ct. App. 1998) (plaintiff raised claim for libel and for unfair business practices under Section 10-1-372(a)(8) based on same conduct); Moulton, 2000 WL 33310901, at * 2-4 (same).

[13] In reaching this conclusion, the Sweeney court compared the scope of Georgia's UDTPA with the scope of the Fair Business Practices Act (FBPA), O.C.G.A. § 10-1-390 et seq., highlighting the breadth of the UDTPA and reinforcing this Court's conclusion that statements need not be made in commercial advertising or promotion to be actionable under Section 10-1-372(a)(8).  Georgia's FBPA prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce," such as "[d]isparaging goods, services, or business of another by false or misleading representation."  O.C.G.A. §§ 10-1-393(a), (b)(8).  Of these two provisions, the Sweeney court noted:

Although the UDTPA and FBPA seem to be very similar, they are distinct in both scope and relief. . . . [M]ore importantly [than the

36

Similarly, in <u>Davita, Inc. v. Nephrology Associates, P.C.</u>, the court considered a Section 10-1-372(a)(8) claim brought by the corporate operator of kidney dialysis centers and individual nephrologists against the former medical directors of the dialysis centers. 253 F. Supp. 2d 1370, 1372 (S.D. Ga. 2003). The accused statements disparaged the plaintiff's business as being unethical and inferior to other competing dialysis centers, such as those of defendants; while it is not clear from the opinion exactly to whom the statements were made, it appears they were made only to another physician and one or more patients of the defendants. <u>Id.</u> at 1376, 1378. The court upheld the UDTPA claim on grounds that the plaintiff had sufficiently alleged all of the statutory elements of the claim, including "publication." <u>Id.</u> at 1379-80. Specifically, the court stated, "[Plaintiff's] allegation sufficiently conveys that the statements were published because harm would not occur if there were no audience." <u>Id.</u> at

---

differences in relief], the UDTPA is broader [than the FBPA] in that it allows recovery whenever a person performs a deceptive trade practice 'in the course of his business, vocation, or occupation.' . . . On the other hand, if a plaintiff is to recover under the FBPA, he or she must show that the unfair or deceptive act occurred during a consumer transaction, act, or practice in trade or commerce.

709 F. Supp. at 1582 (citations omitted).

1380.  See also Dominy v. Shumpert, 510 S.E.2d 81, 86 (Ga. Ct. App. 1998)

(affirming trial court ruling that accused statement–contained in a letter from

the defendant physician to the plaintiff physician's employer, to a hospital

administrator, and to a member of the state medical board and discussing

plaintiff's qualification to practice medicine–was not actionable under § 10-1-

372(a)(8) because it was *privileged*, making no mention of any requirement that

accused statement constitute commercial advertising or promotion to be

actionable).

    Based on the plain language of the UDTPA and the foregoing authority,

the Court agrees with NCG that accused statements 6-19 need only have been

published to be actionable.  In addition to arguing that the statements are not

actionable because they were not made to customers, however, Plaintiff also

seeks summary judgment as to these statements on grounds of privilege.  (Pl.'s

Mot. for Summ. J., Dkt. [194] at 26 of 29.)  Citing O.C.G.A. § 51-5-7(3),

Plaintiff contends that it was privileged to make Statements 6-19, each of which

was made to a regulatory agency or trade association for the purpose of

protecting Plaintiff's interests in the IBC industry by making its position on

cross-bottling known.  (Id. at 19-21, 26 of 29.)

AO 72A
(Rev.8/82)

Under O.C.G.A. § 51-5-7(3), "Statements made with a good faith intent on the part of the speaker to protect his or her interest in a matter in which it is concerned" are deemed to be privileged communications. As the Georgia Supreme Court has held, "One may publish, by speech or writing, whatever he honestly believes is essential to the protection of his own rights or those of another, provided the publication be not unnecessarily made to others than to those whom the publisher honestly believes are concerned in the subject-matter of the publication." Sheftall v. Cent. of Ga. Ry. Co., 51 S.E. 646 (Ga. 1905). Where an accused statement is privileged, it cannot give rise to liability under the UDTPA. See, e.g., Dominy, 510 S.E.2d at 86 ("The presence of privilege combined with the absence of malice also eliminates any claim plaintiff alleged under O.C.G.A. § 10-10372(a)(8).").

The undisputed evidence shows that accused Statements 6 and 7 were made to "various governments or UN delegations." (NCG's SAF, Dkt. [241] ¶ 35.) Statement 8 was made to the executive director of the Rigid Intermediate Bulk Container Association ("RIBCA"). (Id. ¶ 36.) Statements 9-12 were made by Roland Strassburger, Schütz's CEO, to the head of International Negotiations of the Dangerous Goods Division of the United Kingdom's

39

Department of Transport.  (Id. ¶ 37.)  Finally, Statements 13-19 were made by

Dr. Jurgen Huebbe, Schütz's former in-house counsel, to regulatory agencies

such as the DOT.  (Id. ¶¶ 39-41, 43.)

Each of the statements relates to Schütz's concerns with the practice of

cross-bottling, which practice Schütz believes to be harmful to the IBC industry

and adverse to its business interests.[14]  Thus, the statements appear to have been

made in an effort to protect Schütz's interests in a matter in which Schütz

obviously is concerned–the integrity of its products, its business reputation, and

the IBC industry as a whole.  There is no evidence on the Record that these

statements were disseminated beyond the aforementioned trade associations and

regulatory bodies, nor is there any evidence that Schütz acted with malice.

---

[14] For example, Statement 8 reads, "The present practice of some reconditions is clearly upsetting the regulatory framework and corrupting the system.  In the long run, this will strongly discredit the reputation of the IBC as a high-performance packaging, as the performance of these cross-bottled IBC [sic] are clearly below the tested design type."  (NCG's Opp'n Ex. 1, Dkt. [240-1] at 4 of 10.)  Statement 10 reads, "Modifications of all these single components have effects on the function and handling and hence on the safety of the IBC in the complete supply chain."  (Id.)  As another example, Statement 16 reads, "NCG . . . is deliberately using the Schütz certificate supported by the Schütz mark to increase the value of a hybrid Schütz IBC with a cheap inner container marked Mamor."  (Id. at 6 of 10.)

AO 72A
(Rev.8/82)

Accordingly, the Court finds these statements to be privileged and therefore not actionable under the UDTPA.[15]

In sum, the Court finds that Statements 1-5 are not actionable under Section 10-1-372(a)(8) because they are not false. Statements 6-19 are not actionable because they are privileged. Accordingly, Plaintiff's motion for summary judgment on NCG's UDTPA Fifth Counterclaim is **GRANTED**.

C.    Conclusion

In accordance with the foregoing, Plaintiff's Motion for Summary Judgment on NCG's Lanham Act Fourth Counterclaim and UDTPA Fifth Counterclaim is **GRANTED**.

---

[15] NCG argues that Schütz's privilege argument should fail because Schütz failed to plead privilege as an affirmative defense in its answer. (NCG's Opp'n, Dkt. [240] at 25 n.11 of 29.) Assuming privilege is an affirmative defense (which Schütz disputes), the Court finds that Schütz properly has asserted it by raising it in its motion for summary judgment. See, e.g., Grant v. Preferred Research, Inc., 885 F.2d 795, 797-98 (11th Cir. 1989) (finding affirmative defense raised in motion for summary judgment but not pled in answer properly asserted, noting, "The Supreme Court has held that the purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it. . . . Thus, if a plaintiff receives notice of an affirmative defense by some means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice.") (internal quotation marks and citations omitted). NCG does not argue that it has suffered prejudice as a result of Schütz's failure to plead privilege in its answer. Thus, assuming privilege is an affirmative defense, the Court finds it properly raised in Schütz's motion for summary judgment.

**III.** **Defendants Mauser Corporation and National Container Group,**

   **LLC's Motion for Summary Judgment on Plaintiff's Trademark**

   **Claims (Counts II, IV-VI) [187]**

Defendants Mauser and NCG move for summary judgment on Plaintiff

Schütz's trademark claims raised in Counts II, IV, V, and VI of the Complaint.

In Count II, Plaintiff raises a federal law claim for false designation of origin

under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).  In Counts

IV, V, and VI, Plaintiff raises state law trademark claims, specifically, for

deceptive trade practices under Georgia's UDTPA (Count IV), for fraud under

O.C.G.A. § 23-2-55 (Count V), and for common law unfair competition and

deceptive trade practices (Count VI).  The parties agree that the federal Lanham

Act analysis governs the analysis of Plaintiff's state law claims.  (See generally

Defs.' Trademark Mot. for Summ. J., Dkt. [187]; Pl. Schütz's Consolidated

Opp'n to Defs. Mauser and NCG's Mots. for Summ. J. on Plaintiff's Claims

("Pl.'s Consolidated Opp'n"),[16] Dkt. [227].)  Accordingly, resolution of

---

[16] On August 26, 2011, Plaintiff moved the Court for leave to file a
consolidated response brief to Defendants' Motions for Summary Judgment on
Plaintiff's Trademark Claims and on Plaintiff's False Advertising and Unjust
Enrichment Claims (Dkt. 217]), which the Court granted by Order dated August 26,
2011 (Dkt. [219]).

Defendants' motion for summary judgment as to the federal false designation of origin claim will determine the fate of Plaintiff's state law trademark claims. (See Defs.' Trademark Mot. for Summ. J., Dkt. [213] at 9 n.1 of 34 ("Counts IV-VI rise and fall with Plaintiff's federal false designation of origin (i.e., trademark) claim.").)

A.    Lanham Act False Designation of Origin (Count II)

"False designation of origin" is a theory of federal trademark infringement that arises under Section 43(a) of the Lanham Act.  Tana v. Dantanna's, 611 F.3d 767, 770 (11th Cir. 2010).  In this regard, Section 43(a) prohibits the use of a mark that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities."  15 U.S.C. § 1125(a)(1)(A). To establish a prima facie case of false designation of origin, "a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made use of it such that consumers were likely to confuse the two."  Tana, 611 F.3d at 770.

AO 72A
(Rev.8/82)

The theory behind Plaintiff's false designation of origin claim is that Plaintiff has common law trademark rights in the "Schütz" name, and that Defendants unlawfully infringe on those rights by inserting Mauser bottles into used Schütz cages and selling the cross-bottled product without first removing the Schütz mark (i.e., cross-bottling). (Pl.'s Consolidated Opp'n, Dkt. [227] at 5.) Defendants contend they are entitled to summary judgment on this claim because Plaintiff has failed to establish the two essential elements of its claim–first, the existence of trademark rights in the name "Schütz" and, second, a likelihood of confusion resulting from Defendants' cross-bottling. (See generally Defs.' Trademark Mot. for Summ. J., Dkt. [213].)

The first inquiry for the Court is therefore whether Schütz has presented sufficient evidence from which a reasonable jury could find trademark rights in the "Schütz" name. If so, the Court must then determine whether there is sufficient evidence of likelihood of consumer confusion to hold a trial on the merits of Plaintiff's Lanham Act claim. See Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc., 810 F.2d 1546, 1548 (11th Cir. 1987) ("Only if plaintiff has proven [a protectable interest in its corporate

AO 72A
(Rev.8/82)

name] need we reach the issue of whether it has also proved the likelihood of confusion between the two names, the other element needed for recovery.").

### 1. Trademark Right

A trademark is "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods . . . from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. "To satisfy the first element of § 43(a)–proof of a valid trademark–a plaintiff need not have a registered mark." <u>Tana</u>, 611 F.3d at 773. On the contrary, use of a plaintiff's unregistered mark–<u>i.e.</u>, common law trademark–can violate Section 43(a) if the unregistered mark is "so associated with [the plaintiff's] goods that the use of the same . . . mark[ ] by another company constitutes a false representation that its goods came from the same source." <u>Id.</u> (internal quotation marks and citation omitted). Only a sufficiently distinctive common law mark can give rise to a cause of action under the Lanham Act, however. <u>See</u> <u>id.</u> ("[O]nly those marks that are capable of distinguishing the owner's goods from those of others, <u>i.e.</u>, that are sufficiently 'distinctive,' are eligible for federal registration or protection as common law marks under the Lanham Act.").

AO 72A
(Rev.8/82)

The Eleventh Circuit recognizes four categories of distinctiveness, "listed in ascending order of strength: (1) generic–marks that suggest the basic nature of the product or service; (2) descriptive–marks that identify the characteristic or quality of a product or service; (3) suggestive–marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful–marks that bear no relationship to the product or service, and the strongest category of trademarks." Id. at 774. Marks that fall into the last two categories are deemed "inherently distinctive" and generally are entitled to trademark protection. Id. (citation omitted). The first category of marks, generic marks, generally are not entitled to trademark protection. Id. (citation omitted). Descriptive marks are not "inherently distinctive," but they may become sufficiently distinctive to enjoy trademark protection if they acquire "secondary meaning." Id. (citing 15 U.S.C. § 1052(f)).

In this case, Plaintiff Schütz claims to have protectable trademark rights in the name, "Schütz," which is the last name of Plaintiff's founder, Udo Schütz. (Defs. Mauser and NCG's Statement of Undisputed Material Facts in Supp. Trademark Mot. for Summ. J. ("Defs.' Trademark SMF"), Dkt. [214] ¶

46

60.)  Names are descriptive marks, which, as stated above, are entitled to

trademark protection only if they have acquired secondary meaning.  Tana, 611

F.3d at 774.  Furthermore, they are entitled to this protection only if secondary

meaning existed prior to the time the alleged infringer first began using the

mark.[17]  Gift of Learning Foundation, Inc. v. TGC, Inc., 329 F.3d 792, 800

(11th Cir. 2003).  Establishing secondary meaning requires a "high degree of

proof."  Id.

### a.    Secondary Meaning

To show that a name has acquired secondary meaning, a plaintiff must

show that "the primary significance of the [name] in the minds of the

consuming public is not the product but the producer."  Tana, 611 F.3d at 774

(internal quotation marks and citation omitted).  In other words, "[i]f the

corporate name denotes to the consumer or purchaser 'a single thing coming

from a single source,' then it has acquired secondary meaning."  Am.

---

[17] There appears to be a factual dispute in this case regarding when NCG first began selling the accused cross-bottled IBC.  NCG contends the relevant date is 2003 (Defs.' Trademark Mot. for Summ. J., Dkt. [213] at 9); Schütz disputes this allegation, arguing the evidence to show that NCG did not begin selling the accused product until a later date (Pl.'s Resp. to Defs.' Trademark SMF, Dkt. [228] ¶ 18).  However, because the evidence relied on by the Court regarding secondary meaning predates 2003, the earlier of the potentially relevant dates, this dispute of fact is immaterial.

AO 72A
(Rev.8/82)

Television & Commc'ns Corp., 810 F.2d at 1549 (citing Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co., 494 F.2d 3, 12 (5th Cir. 1974)).  When, as in this case, there is no consumer survey evidence on the issue, courts consider the following factors to determine whether a name has acquired secondary meaning:

> (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by plaintiff to promote a conscious connection in the public's mind between the name and plaintiff's business; and (4) the extent to which the public actually identifies the name with plaintiff's goods and services.

Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C., 931 F.2d 1519, 1525 (11th Cir. 1991) (citation omitted).  The fourth factor listed above is "the most telling."  Conagra, Inc. v. Singleton, 743 F.2d 1508, 1513 (11th Cir. 1984.)

In support of its claim that the "Schütz" name is a protectable trademark, Plaintiff argues, first, that its brand name is strong and widely recognized by consumers.  (Pl.'s Consolidated Opp'n, Dkt. [227] at 11-12, 29-31, 37-39 of 60.)  In support of this argument, Plaintiff puts forward evidence that Defendants themselves describe the Schütz brand as strong and admit that brand

48

recognition gives Schütz a competitive advantage in the marketplace. For example, in the deposition of T.J. Janowski of Mauser, the deponent admitted that Mauser believes the name Schütz to be "widely recognized by customers." (Pl.'s App'x of Excerpts and Materials in Supp. Pl.'s Consolidated Opp'n ("Pl.'s App'x"), Dkt. [227] Tab H, 12/2/10 Dep. of Mauser & T.J. Janowski, at 223: 7-9.) Likewise, in a deposition of NCG designee Kathryn Graue, Graue stated that Schütz "ha[s] a strong reputation in the marketplace." (Pl.'s App'x, Dkt. [227] Tab F, 11/5/10 Dep. of NCG (Kathryn Graue, Designee), at 119:18-23.) Similarly, several Mauser presentations regarding IBCs and the IBC market list Schütz's market advantages over Mauser as including "brand name," "global recognition," being a "technological leader," and being perceived as higher quality. (Id. Tab H, Ex. 118 at 11; Ex. 117 at DEFS0029453.)[18]

Plaintiff also points to its long-standing presence in the United States IBC market, its efforts to advertise and promote its IBC, and its high volume of

---

[18] See also Pl.'s App'x, Dkt. [227] Tab B, 12/15/10 Dep. of Schütz (Brett W. White, Designee), at 73:19-20 ("The feedback from the market is that we have the best quality IBC on the market."); 74:9-14 ("I'm referring to the market, getting feedback from the market telling us through our customers, other customers, other feedback through trade shows. Anybody that knows the IBC market knows that Schütz has the best quality. If you're in that market, you know that Schütz is the best.").

sales in the U.S. IBC market. Specifically, Plaintiff presents evidence that it was founded in the United States in 1990 (as an affiliate of the worldwide Schütz organization) and has since that time been the exclusive manufacturer and dealer of original Schütz products in the United States. (Pl.'s Consolidated Statement of Additional Facts in Response to Defs.' Mots. for Summ. J. on Pl.'s Claims ("Pl.'s Consolidated SAF"), Dkt. [230] ¶¶ 7, 9; Decl. of Ian Miller ("Miller Decl."), Dkt. [231] ¶¶ 3-4.) Since that time, Schütz has marketed all of its products under the "Schütz" brand name and has marketed its products in the United States through various media, including its website, brochures, and trade shows. (Pl.'s Consolidated SAF, Dkt. [230] ¶¶ 12-15.) Plaintiff contends that since at least 1998, Schütz has spent up to approximately $150,000 annually on trade show expenditures. (Id. ¶ 16.) Finally, the undisputed evidence shows that in terms of sales, Schütz has been the market leader in the United States in IBCs since well before 2000. (Pl.'s Consolidated SAF, Dkt. [230] ¶ 11; Miller Decl., Dkt. [231] ¶ 6; Defs.' Resp. to Pl.'s Consolidated SAF, Dkt. [257] ¶ 11 ("Assuming that by 'market leader,' Schütz refers only to sales, and not to quality, Defendants do not challenge this alleged fact . . . .").)

The Court finds that Schütz has presented sufficient evidence of secondary meaning to withstand Defendants' motion for summary judgment. With regard to the first three factors listed above (length and manner of use, nature and extent of advertising/ promotion, and efforts to promote brand recognition), Schütz has presented evidence that it has marketed its products in the United States for over twenty years, exclusively under the brand name Schütz. It also has presented evidence of efforts to advertise and promote its brand name through trade shows, its website, and brochures. The evidence also shows–and Defendants do not dispute–that Schütz has been the market leader in terms of IBC sales since before the year 2000. Most importantly, and with relevance to the fourth factor (extent to which public identifies name with claimant's goods), Schütz has presented compelling evidence of the strength of its brand name in the IBC market. Indeed, Defendants themselves have admitted, in both depositions and corporate documents pre-dating this litigation, that the Schütz name is "widely" and "globally" "recognized by customers" and that Schütz has a "strong reputation in the marketplace." In light of this evidence, a reasonable jury could find the "Schütz" name to have acquired secondary meaning so as to be entitled to trademark protection. Defendants

51

thus are not entitled to summary judgment on the ground that Plaintiff has failed

to establish trademark rights in the "Schütz" name.

### b. Abandonment

In addition to arguing that Plaintiff has presented insufficient evidence of

"secondary meaning," Defendants argue that Plaintiff is not entitled to

trademark protection of the "Schütz" mark because Plaintiff has failed to take

action against other alleged infringers, thereby forfeiting any distinctiveness the

"Schütz" mark may have had.  (Defs.' Trademark Mot. for Summ. J., Dkt. [213]

at 18-20 of 34.)  To the extent Defendants contend that the Schütz mark has

been abandoned, their motion for summary judgment fails.  "The defense of

abandonment requires strict proof."  <u>Bd. of Regents v. Buzas Baseball, Inc.</u>, 176

F. Supp. 2d 1338, 1349 (N.D. Ga. 2001).  To prevail on a defense of

abandonment, a defendant "'must show that the plaintiff actually abandoned the

use of the mark, and, also, that the plaintiff intended to abandon the mark.'"  <u>Id.</u>

(quoting <u>Citibank, N.A. v. Citibanc Group, Inc.</u>, 774 F.2d 1540, 1545 (11th Cir.

1984)).  Because Defendants have failed to point to any evidence that Plaintiff

has abandoned use of the Schütz mark, much less that it intended to do so,

AO 72A
(Rev.8/82)

Defendants are not entitled to summary judgment on the ground of abandonment.

To the extent Defendants contend that the "Schütz" mark has become generic because of Plaintiff's failure to take action against other alleged infringers, the motion for summary judgment similarly fails. Defendants contend that at least six entities other than Defendants also cross-bottle using a Schütz outer cage. (Defs.' Trademark Mot. for Summ. J., Dkt. [213] at 18 of 34.) Defendants further contend that Schütz is aware of this fact and yet has failed to take any legal action against these other entities to stop the alleged infringement. (Id.) "If a 'trademark' symbol is used as a generic name of a product or service, it ceases to function to identify a single source of that generic thing." 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 17:8 (4th ed.). "Sometimes a mark becomes abandoned to generic usage as a result of a trademark owner's failure to police the mark, so that widespread usage by competitors leads to a generic usage among the relevant public, who see many sellers using the same word or description." Id. (citing as examples the use of the term "Yellow Pages" to refer to a phone book or the term "Pilates" to refer to a general system of physical exercise).

53

In this case, the only evidence Defendants put forward in support of their argument that Plaintiff has abandoned the name "Schütz" to generic usage is that Plaintiff has failed to take legal action against any of the six companies that Defendants contend are engaged in the same cross-bottling activities as Defendants. Putting aside the factual dispute regarding the number of entities that Schütz knew to be cross-bottling using a Schütz container (compare Defs.' Trademark SMF, Dkt. [214] ¶ 27 and Pls.' Response to Defs.' Trademark SMF, Dkt. [228] ¶ 27), evidence that Plaintiff has failed to take legal action against other possible infringers–in this case, six at most– falls woefully short of proving abandonment of Plaintiff's trademark to generic use. See Bd. of Regents, 176 F. Supp. 2d at 1349 ("'Failure to institute legal action against an infringer is insufficient to establish abandonment of a trademark.'") (quoting Babbit Elecs., Inc. v. Dynascan Corp., 38 F.3d 1161, 1180 (11th Cir. 1994)). Defendants have failed to produce sufficient evidence of abandonment to be entitled to judgment on Plaintiff's trademark claims as a matter of law.

In sum, Defendants are not entitled to summary judgment on Plaintiff's trademark claims on grounds that Plaintiff has failed to establish trademark rights in the "Schütz" name. On the contrary, as explained above, Plaintiff has

54

presented sufficient evidence from which a reasonable jury could find "Schütz" to have acquired secondary meaning so as to be entitled to trademark protection. Additionally, Defendants have failed to show abandonment of the "Schütz" mark. Having found sufficient evidence of a protectable trademark right, the Court must next determine whether Plaintiff has presented sufficient evidence of a likelihood of consumer confusion to permit its trademark claims to go to trial.

## 2. *Likelihood of Consumer Confusion*

In addition to arguing that Plaintiff cannot prove to have trademark rights in the "Schütz" name, Defendants argue that Plaintiff has failed to put forward sufficient evidence from which a reasonable jury could find a likelihood of consumer confusion. (Defs.' Trademark Mot. for Summ. J., Dkt. [213] at 20-31 of 34.) As a threshold matter, the parties dispute what test should govern the likelihood of confusion analysis. Defendants contend that a seven-factor test should apply; under this test, courts consider the following factors to determine whether there is a likelihood of confusion between two marks:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4)

similarity of the actual sales methods used by the holders of the
marks, such as their sales outlets and customer base; (5) similarity
of advertising methods; (6) intent of the alleged infringer to
misappropriate the proprietor's good will; and (7) the existence
and extent of actual confusion in the consuming public.

Tana, 611 F.3d at 774-75.  Plaintiff, on the other hand, argues that because this

is a case concerning the sale of altered goods sold under the original

manufacturer's mark, the "material differences" test should apply.  (Pl.'s

Consolidated Opp'n, Dkt. [227] at 20-22 & 28 of 60.)

The "material differences" test is an exception to the "first sale doctrine."

Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1298-99 (11th Cir.

2001).  Under the first sale doctrine, "a trademark owner's authorized initial

sale of its product exhausts the trademark owner's right to maintain control over

who thereafter resells the product; subsequent sales of the product by others do

not constitute infringement even though such sales are not authorized by the

trademark owner."  Id.  In other words, under the first sale doctrine, "the resale

of genuine trademarked goods does not constitute infringement."  Id. at 1301.

Contrary to Defendants' argument (Defs.' Reply in Supp. Trademark Mot. for

Summ. J., Dkt. [255] at 9-11 of 22), the first sale doctrine is not an affirmative

defense.  Hi-Tech Pharm., Inc. v.Demelo, No. 1:07-cv-1934-RWS, 2009 WL

56

901156, at *5 (N.D. Ga. 2009) (citation omitted). On the contrary, the rule "defines an area of commerce beyond the reach of trademark law." Id. Under the "material differences" exception to the first sale doctrine, the unauthorized resale of trademarked products will constitute infringement if the products are materially different from those sold by the trademark owner. Davidoff, 263 F.3d at 1299. In other words, materially different products bearing the same trademark are inherently likely to confuse. Id. at 1302; Hi-Tech Pharm., 2009 WL 901156, at *5.

The material differences test is rooted in the Supreme Court decision Champion Spark Plug Co. v. Sanders, 331 U.S. 125 (1947). In Champion, the Court considered a trademark infringement claim concerning reconditioned spark plugs that were sold under the original trademark. The defendant in Champion collected used plugs and then cleaned, repaired, and sold them, stamped with the word "Renewed" but still bearing the trademark "Champion." Id. at 126. On the facts before it, the Court found no trademark infringement so long as the defendant continued to label each plug "Renewed." Id. at 128-29. The Court reasoned:

AO 72A
(Rev.8/82)

The spark plugs, though used, *are nevertheless Champion plugs and not those of another make*. There is evidence to support what one would suspect, that a used spark plug which has been repaired or reconditioned does not measure up to the specifications of a new one. . . . [But,] [a] trade-mark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his. . . . [I]nferiority is expected in most second-hand articles. Indeed, they generally cost the consumer less. That is the case here. Inferiority is immaterial so long as the article is clearly and distinctively sold as repaired or reconditioned rather than as new.

Id. at 128-30 (emphasis added). The Court, however, also noted the limits of its holding:

Cases may be imagined *where the reconditioning or repair would be so extensive or so basic that it would be a misnomer to call the article by its original name, even though the words "used" or "repaired" were added*. . . . But no such practice is involved here. The repair or reconditioning of the plugs *does not give them a new design. It is no more than a restoration, so far as possible, of their original condition.*

Id. at 129 (emphasis added).

The Eleventh Circuit adopted the material differences test in Davidoff, 263 F.3d at 1299. In Davidoff, the Court considered a claim that a distributor's resale of trademarked perfume constituted infringement where original batch codes on the perfume bottles and packaging were obliterated prior to resale. Specifically, the codes on the outside packaging were covered with white

58

stickers and the codes on the bottles themselves etched off, leaving a mark on the base of each bottle. The defendant claimed that customers could not be confused by the sale of the product in this condition because the product itself–the perfume–remained "absolutely the same." Id. at 1300. The Court disagreed, however, and affirmed the trial court's finding that the etching on the bottles satisfied the material differences test by degrading the appearance of the product. Id. at 1302-03. This degradation could cause customers to believe that the product had been tampered with, thus eroding the manufacturer's goodwill and causing a likelihood of confusion. Id.

In reaching this conclusion, the Davidoff court explained both the limits and the breadth of the material differences test: "Not just any difference will cause consumer confusion. A material difference is one that consumers consider relevant to a decision about whether to purchase a product. . . . Because a myriad of considerations may influence consumer preferences, [however,] the threshold of materiality must be kept low to include even subtle differences between products." Id. at 1302.

While the Court suspects that the material differences test is the more appropriate test in this case, for purposes of Defendants' motion, it need not

59

decide this issue. Under either test, the Court finds sufficient evidence from which a reasonable jury could find a likelihood of consumer confusion. First, under Plaintiff's proposed test, the Court finds sufficient evidence that Defendants' cross-bottled IBC is materially different from the Schütz IBC, such that retention of the Schütz mark is likely to cause consumer confusion as to the source of the cross-bottled product.

In this regard, Plaintiff has presented evidence that the two products are structurally different. The Schütz IBC consists of a Schütz outer metal cage and Schütz inner plastic bottle, the latter of which is specifically designed for the Schütz cage. (Pl.'s Consolidated Opp'n, Dkt. [227] at 10 of 60.) The Mauser IBC, on the other hand, consists of a Mauser outer cage and Mauser inner bottle, both of which are of a different design. (Id. at 13 of 60.) The Mauser bottle is specifically designed for the Mauser cage: it has indentations on each of its four side walls, which match perfectly with the metal bars of the Mauser cage. (Id. at 25 of 60.) The indentations on the Mauser bottle do not match up with the bars on the Schütz cage. (Pl.'s App'x, Dkt. [227], Tab D, 11/4/2010 Dep. of NCG (Michael Porreca, Designee), at 23:25-24:16.) (See also id. Tab VV & WW (detailing different structures of Mauser and Schütz IBCs); Tab

DD, Am. Expert Report of Dr. Sher Paul Singh, at 11-34 (describing "material

differences" between the two products, including in design, shape, thickness of

inner plastic bottles, and material from which bottles are made).)

Plaintiff also has presented evidence that Schütz and Defendants subject

their products to different performance standards.  For example, Schütz has put

forward evidence that it tests and certifies its IBCs at 100 kPa of hydrostatic

pressure, while Defendants test and certify their cross-bottled products at the

lower level of 80 kPa.  (Id. Tab XX, at 3, 15; Tab I, Ex. 272.)  Furthermore,

Plaintiff has presented evidence that the performance of Defendants' cross-

bottled products are inferior to the performance of Schütz IBCs.  (Id. Tab DD,

Am. Expert Report of Dr. Sher Paul Singh, at 36.)  Finally, Plaintiff has

presented evidence that Defendants' cross-bottled IBC is classified by the UN

and USDOT as being of a different design type than non-cross-bottled IBCs

(e.g., the Schütz/Schütz IBC).  As explained in a UN newsletter on the transport

of dangerous goods:

> If an IBC inner receptacle is replaced with a new one of identical
> specification, made by the original manufacturer, this is deemed a
> repair.  Some manufacturers do offer this service.

> However if a receptacle of a specification which is different from
> the original (including one from a different source), is fitted into
> the frame of an approved IBC type, it is considered remanufacture
> and results in a different design type. This will invalidate the
> original UN approval. The 'new' design type will have to be
> tested and a new certification issued before it may be used for
> dangerous goods.

(Id. Tab UU, at Schutz_NCG - 0113684.) Based on this evidence, the Court finds that a reasonable jury could conclude that Defendants' product is materially different from Plaintiff's and likely to cause consumer confusion when it bears the "Schütz" name.

The Court also finds that under the seven-factor test, a reasonable jury could conclude that retention of the Schütz mark on Defendants' cross-bottled IBC is likely to cause consumer confusion. With regard to the first factor, strength of the mark, the Court has already found sufficient evidence from which a reasonable jury could find secondary meaning based on the strength of Plaintiff's brand. (See discussion at Part II.A.1.a., supra.) "A descriptive mark with secondary meaning is a relatively strong mark." Tana, 611 F.3d at 776 (citing Dieter v. B&H Indus., 880 F.2d 322, 329 (11th Cir. 1989).

Factors two through five, as set out above, consider the similarity between the infringed and infringing marks (factor 2), the goods offered under

the marks (factor 3), and the sales and advertising methods used by the parties

with respect to the goods (factors 4 and 5). In this case, the alleged infringed

and infringing marks are identical, as Defendants–the alleged infringers–retain

Plaintiff's mark on their cross-bottled products. Likewise, the goods sold under

the marks are identical, as both parties sell IBCs bearing the Schütz mark.

Indeed, Defendants concede that "the marks are identical and that they are both

on IBCs . . . ." (Defs.' Trademark Reply, Dkt. [255] at 17 of 22.) Plaintiff has

also presented evidence that the parties utilize similar sales and advertising

methods and target similar customers, which Defendants do not dispute. (See

id. at 17 of 22 ("Defendants do not dispute that . . . [both parties'] IBCs [are]

sold to similar customers through sales representatives and trade shows.").)

This is sufficient evidence from which a reasonable jury could find factors two

through five to weigh in favor of finding a likelihood of consumer confusion.

Factors six and seven, however, are less demonstrative of a likelihood of

consumer confusion. With respect to factor six, intent to misappropriate,

Plaintiff contends that a reasonable jury easily could *infer* intent to

misappropriate Schütz's goodwill from the fact that Defendants retain the

Schütz mark on their products. (Pl.'s Consolidated Opp'n, Dkt. [227] at 32 of

63

60.)  Plaintiff also points to the fact that Defendants often send price quotes to customers referencing Schütz's products.  Finally, Plaintiff points to a flyer used by Defendants to advertise the Mauser IBC, which flyer depicts the Mauser IBC next to a genuine Schütz IBC.  (Id. at 31 of 60.)  Plaintiff contends that this evidence demonstrates Defendants' intent to market their goods through use of the Schütz mark.  (Id.)

The Court finds this evidence only minimally probative of an intent to misappropriate Plaintiff's goodwill.  Because NCG is in the reconditioning business, and because it cross-bottles, it is not surprising that quotes to customers would reference cages manufactured by Schütz or other non-Mauser entities.  Similarly, given that the parties are competitors, it is not surprising that Defendants would show a picture of its product next to Plaintiff's to highlight the features it contends make its product more desirable.  In short, the evidence cited by Plaintiff is equally indicative of an effort to compete than an effort to trade on Plaintiff's name.  Similarly, the Court finds little to no evidence of actual consumer confusion (factor 7).  On the contrary, most of the argument in Plaintiff's brief regarding this factor concerns Plaintiff's contention that the material differences test should apply, according to which a likelihood

64

of confusion may be presumed.  (Pl.'s Consolidated Opp'n, Dkt. [227] at 34-35 of 60.)

Although Plaintiff has presented only minimal evidence with respect to factors six and seven, the Court nonetheless finds there is sufficient evidence from which a reasonable jury could find a likelihood of consumer confusion.  In particular, the trademarks at issue in this case (the "Schütz" name) and the products under which they are sold (IBCs) are both identical, not merely similar.  Additionally, the parties market their products through the same channels and to similar customers.  Based on this evidence, a jury reasonably could find a likelihood of confusion despite a weaker showing of bad intent or actual confusion.  In sum, under either the material differences test or the seven-factor test, Plaintiff has produced sufficient evidence from which a reasonable jury could find a likelihood of consumer confusion.

Defendants argue, on the contrary, that no reasonable consumer could be confused as to the source of the accused cross-bottled IBCs given that NCG places a sticker on the IBCs disclaiming any affiliation with Plaintiff and clearly stating that the IBCs are "remanufactured."  (Defs.' Trademark Mot. for Summ. J., Dkt. [213] at 8-9, 20 of 34.)  The sticker reads as follows:

65

Remanufactured IBC:

Original cage and pallet from Schütz Container Systems provided with a new inner tank manufactured by Mauser.

Remanufacturer: National Container Group. Schütz has not reconditioned this product and is not affiliated in any way with National Container Group and/or Mauser.

(App'x of Ex. to Defs.' Trademark Mot. for Summ. J. ("Defs.' Trademark App'x"), Dkt. [214] Tab P, at 3.) The Court agrees with Defendants that, notwithstanding the Court's likelihood of confusion analysis above, the presence of this sticker on a cross-bottled IBC would preclude any reasonable consumer from claiming confusion as to the source of the IBC. Thus, the Court holds as a matter of law that to the extent NCG's cross-bottled IBCs bear this sticker, no reasonable consumer could be confused as to the IBC's source. By extension, to the extent NCG's cross-bottled IBCs contain this sticker, Plaintiffs' trademark claims necessarily fail. The Court reaches this conclusion in spite of Plaintiff's argument that the dicta in Champion, discussed above, demands a different result.

In Champion, the Supreme Court noted that there may be cases where the reconditioning of a trademarked good is so extensive that it results in a good of

AO 72A
(Rev.8/82)

a different design; in such cases, retention of the original mark may constitute

trademark infringement, despite the fact that the reconditioned good is labeled

"used" or "reconditioned." In other words, the Court noted that where the

reconditioning of a good results in a different design, it is possible that

consumers would be confused as to the good's source, despite the fact that the

good clearly is labeled "used." This, however, is not such a case. In this case,

the sticker used by NCG goes far beyond notifying the consumer that the IBC

on which it is placed is "used"; on the contrary, the sticker explicitly notifies

consumers that the IBC has been "remanufactured" by NCG; that it contains an

original cage and pallet from Schütz but a new inner tank manufactured by

Mauser; and that Schütz played no role in the IBC's remanufacture and is not

affiliated with either Defendant. In light of the sticker's detailed and explicit

contents, the Court finds that no reasonable consumer could be confused as to

the source of a cross-bottled IBC bearing this sticker.

The Court also finds, however, that there is a genuine dispute of material

fact regarding the extent to which NCG places this sticker on its cross-bottled

IBCs. Plaintiff has presented evidence that NCG does not place the sticker on

every cross-bottled IBC that it sells. For example, Plaintiff points to the report

of its expert, Dr. Singh, documenting his finding that out of a sample of NCG's cross-bottled IBCs, not every IBC bore the "remanufactured" sticker. (Pl.'s App'x, Dkt. [227] Tab DD, Singh Expert Report at 8 ¶ 12, Table 1 at 9.) Plaintiff also points to the deposition testimony of NCG designee Michael Porreca, in which he stated that NCG does not put the "remanufactured" sticker "on all cross-bottled Mauser bottle - Schütz cage IBCs." (Id. Tab D, 11/4/2010 Dep. of NCG (Michael Porreca, Designee), at 45:6-14.) Porreca testified that when NCG rebottles a Schütz IBC (i.e., removes the old bottle and inserts a new one in the original cage), it places the sticker on the IBC; when NCG receives a cross-bottled IBC only in need of washing, however, it does not. (Id. at 45:19-46:9.) Thus, Porreca explained, "if we place the bottle in the cage, we affix the label. If in six months the exact same container is returned to us, we do not affix a label." (Id. at 45:19-22.) The Court finds this to be sufficient evidence from which a reasonable jury could find that the "remanufactured" label is not affixed to each of NCG's cross-bottled IBCs. To this extent, in light of the Court's analysis above, a reasonable jury could find a likelihood of consumer confusion as to the source of Defendants' cross-bottled IBCs.

68

In sum, the Court has found sufficient evidence of trademark rights in the Schütz name and, to the extent NCG's cross-bottled IBCs do not bear the "remanufactured" label, a likelihood of consumer confusion, such that a reasonable jury could find Defendants liable for trademark infringement under the Lanham Act. Accordingly, Defendants' motion for summary judgment on Plaintiff's Lanham Act false designation of origin claim is **DENIED**.

B.      State Law Trademark Claims (Counts IV-VI)

Based on the Court's ruling in Part III.A., <u>supra</u>, denying Defendants' motion for summary judgment on Plaintiff's federal law trademark claim, Defendants' motion is likewise **DENIED** as to Plaintiff's state law trademark claims. (<u>See</u> Defs.' Trademark Mot. for Summ. J., Dkt. [213] at 9 n.1 of 34 ("Counts IV-VI rise and fall with Plaintiff's federal false designation of origin (<u>i.e.</u>, trademark) claim.").)

**IV.    Defendant Mauser Corporation and National Container Group, LLC's Motion for Summary Judgment on Plaintiff's False Advertising Claims (Counts III-VI) and Unjust Enrichment Claim (Count VII) [188]**

AO 72A
(Rev.8/82)

Defendants Mauser and NCG also move for summary judgment on Plaintiff's false advertising claims, raised in Counts III, IV, V, and VI of the Complaint, and unjust enrichment claim, raised in Count VII. In Count III, Plaintiff raises a federal law claim for false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), based on accused statements made by Defendants in connection with the marketing of their cross-bottled IBCs. In Counts IV, V, and VI, Plaintiff raises claims under state law based on the same accused false advertising, specifically, for deceptive trade practices under Georgia's UDTPA (Count IV), for fraud under O.C.G.A. § 23-2-55 (Count V), and for common law unfair competition and deceptive trade practices (Count VI).

With respect to the false advertising claims, the parties agree that the federal Lanham Act analysis governs the analysis of the state law claims. (Defs.' False Advertising & Unjust Enrichment Mot. for Summ. J., Dkt. [215] at 8 n.1 of 39 ("Count III of Plaintiff's Complaint is a claim for false advertising under the Lanham Act. State law claims for false advertising are treated the same as a Lanham Act claim. . . . Thus, to the extent Plaintiff is basing its state law claims for deceptive trade practices (Count IV), fraud

70

(Count V), and unfair competition (Count VI) on the accused false advertising, these Counts rise and fall with Count III."); Pl.'s Consolidated Opp'n, Dkt. [227] at 57 n.35 of 60 ("Schütz's Lanham Act claims and Schütz's state law claims are analyzed similarly. . . . Accordingly, Defendants' motion for summary judgment on Schütz's state law claims must fail for the reasons set forth [in connection with the Lanham Act claim]."). Accordingly, resolution of Defendants' motion for summary judgment on Plaintiff's federal law false advertising claim necessarily will resolve the motion as to Plaintiff's state law false advertising claims. The Court first considers Defendants' motion as to the false advertising claims before turning to the claim for unjust enrichment.

A.    Lanham Act False Advertising (Count III)

As stated in connection with Schütz's motion for summary judgment on NCG's Lanham Act false advertising counterclaim (see Part II.A., supra), Section 43(a) of the Lanham Act prohibits the use of any "false or misleading description of fact . . . which in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of . . . another persons's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). In this case, Plaintiff Schütz accuses Defendants of false

71

advertising based on fourteen (14)[19] statements concerning the quality and performance of Defendants' cross-bottled IBCs.[20] (Pl.'s Consolidated Opp'n, Dkt. [227], at 42-56 of 60.) To prevail on a Lanham Act false advertising claim, the claimant must ultimately prove that "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been–or is likely to be–injured as a result of the false advertising." Johnson & Johnson Vision Care, Inc., 299 F.3d at 1247 (citation omitted). If

---

[19] Plaintiff Schütz originally identified a total of thirty-six (36) accused statements. (Defs. Mauser and NCG's Statement of Undisputed Material Facts in Supp. False Advertising & Unjust Enrichment Mot. for Summ. J. ("Defs.' False Advertising & Unjust Enrichment SMF"), Dkt. [216] ¶ 26.) In its Consolidated Opposition brief, Schütz withdrew twenty-two (22) of those statements: Statements 3, 5-6, 10, 15-25, 29, 31-36. (Dkt. [227] at 56.) (The statement numbers used by the Court correspond to the numbering used by Defendants in their motion. (See Defs.' False Advertising & Unjust Enrichment Mot. for Summ. J., Ex. 1, Dkt. [215] at 34-39 (numbering accused statements).) Defendants thus are entitled to summary judgment as to Statements 3, 5-6, 10, 15-25, 29, and 31-36.

[20] Plaintiff also identifies Defendants' retention of the Schütz mark on its cross-bottled products as false advertising actionable under federal and state law. (Pl.'s Consolidated Opp'n, Dkt. [227] at 42 of 60 (citing Pl.'s Fifth Supplemental Resps. and Objections to Defs.-Countercl. Pls.' First Set of Interrogs.).) Because Defendants have moved for summary judgment only with respect to the accused statements, the Court does not consider this aspect of Plaintiff's false advertising claims.

72

the claimant fails to make a showing sufficient to establish the existence of any one of these essential elements, summary judgment properly may be granted against him.  Celotex Corp., 477 U.S. at 322-23.

Each statement Plaintiff identifies as constituting false advertising makes the same general claim: that Defendants' cross-bottled IBCs are comparable to Schütz's IBCs in terms of overall condition or performance.  The fourteen remaining accused statements, Statements 1, 2, 4, 7-9, 11-14, 26-28, and 30,[21] read as follows:

1.    "Therefore it is assured that every remanufactured IBC has a performance that can be compared to that of a new one."

2.    "Reconditioning okay as long as quality is ensured."

4.    "and the (equal) quality and certification of reconditioned packaging."

7.    "We clean, pressure test, and inspect each IBC meticulously.  Any suspect parts are replaced.  Then the finished IBC goes through a multistep quality assurance process to ensure you always get the level of performance you expect."

8.    "This program is your guarantee that the IBC mirrors new units."

---

[21] The Court numbers the accused statements in accordance with the numbering used by Defendants in their brief.  (See Defs.' False Advertising & Unjust Enrichment Mot. for Summ. J., Dkt. [215] at 34-39 of 39 (numbering accused statements).)

9.    "These rebottled IBCs are comparable to completely new units."

11.   "I still maintain that the product quality will not be compromised with the rebottled units . . . ."

12.   "Regarding the 275 gal. replacement bottles, the Mauser bottle is interchangeable with the Schuetz cage" [sic]

13.   "The current rebottle requirement will identify a Schuetz reconditioned cage with a 275 gallon new Mauser bottle. All Schuetz cages will be inspected to insure IBCs perform to new manufactured specifications."

14.   "Reconditioning without any loss of quality!"

26.   "restoring the container to its original condition."

27.   "We clean it [container] completely, conduct thorough inspections, and replace worn closures, thus restoring the container to its original condition. So you can depend on getting exactly the performance and quality you bargained for."

28.   "We clean, pressure test, and inspect each container meticulously, replacing suspect parts and restoring the container to its previous performance standards."

30.   Ad showing photos of IBCs labeled "Mauser" and "Schütz" "We Offer: 275 & 330 gallon New Bottle & Reconditioned Totes" "White (UV Protection) Bottles / EPA One-way Valves / 3" Valve / Part Sales" [sic]

Defendants move for summary judgment as to these statements on several different grounds. First, Defendants argue that Statements 1, 2, 4, 7-9,

74

and 11-14 are not actionable because they are not contained in a commercial advertising or promotion.  (Defs.' False Advertising & Unjust Enrichment Mot. for Summ. J., Dkt. [215] at 12-14 of 39.)  Second, Defendants contend that Statements 26-28 and 30 are not actionable because they are neither false nor misleading.  (Id. at 17-26 of 39.)  And finally, Defendants contend that none of the statements is actionable on the added ground that Plaintiff has failed to show injury as a result of the statements.  (Id. at 26-27 of 39.)  The Court considers these arguments in turn.

### 1.    Commercial Advertising or Promotion

As stated above, Defendants contend that ten of the accused statements (Statements 1, 2, 4, 7-9, and 11-14) are not actionable as a matter of law because they were not made in "commercial advertising or promotion," as is required under the plain language of Section 43(a) of the Lanham Act.  (Id. at 12 of 39; id. Ex. 1 at 36-36 of 39.)  In particular, Defendants contend that Statements  2, 4, and 7-9 were never distributed outside the Defendant entities, and that Statements 1 and 11-14 were not sufficiently disseminated to rise to the level of "commercial advertising or promotion" (being distributed only to one

75

or two customers and, in the case of Statement 1, only to non-U.S. customers). (Id. at 13-14 of 39.)

### a.    Statements 2, 4, and 7-9

The undisputed evidence in this case establishes that Statements 2, 4, and 7-9 were never distributed to customers but rather were used for Defendants' internal purposes only.  Statement 2 appears in a document entitled "Stakeholder Engagement Client Feedback Mauser Sustainability."  (Defs.' False Advertising & Unjust Enrichment SMF, Dkt. [216] ¶ 29.)  This document is a summary of client interviews that was created by a consulting firm (the "BEOC Group") for executives of Mauser and NCG.  (Id. ¶¶ 31-32.)  Most importantly, this document was never sent or presented to customers.  (Id. ¶ 32.) Similarly, Statement 4 is contained in a PowerPoint presentation entitled "Workshop 2: Mauser Sustainability Program," which presentation was created by the BEOC Group and presented to Mauser's sustainability committee.  (Id. ¶ 34-35.)  This presentation was never sent or presented to customers either.  (Id. ¶ 36.)  Finally, Statements 7-9 each appear in a draft document entitled "IBC Sell Sheet."  (Id. ¶¶ 41-43.)  This draft document was prepared by Johnson

Marketing for NCG but was never purchased by NCG.  (Id. ¶ 45.)  Thus, the document was never distributed to customers. (Id. ¶ 46.)

Plaintiff Schütz concedes that the statements specifically identified as Statements 2, 4, and 7-9 were never disseminated to customers.  (Pl.'s Response to Defs.' False Advertising & Unjust Enrichment SMF, Dkt. [229] ¶¶ 32, 36, 46.)  However, Plaintiff argues that fact to be immaterial on grounds that similar statements have been disseminated to customers as part of a broader campaign to convince purchasers that cross-bottled products perform as well as the Schütz product.  (Pl.'s Consolidated Opp'n, Dkt. [227] at 43-45 of 60.)  In other words, Plaintiff argues that while the specifically identified statements were never distributed to customers, they are illustrative of–and embody the same message contained in–statements that Defendants routinely disseminate to customers as part of their market strategy of persuading customers that cross-bottled IBCs are of the same quality and perform to the same standard as the Schütz IBC.  (Id.)

In support of this argument, Plaintiff points to the deposition testimony of NCG and/ or Mauser representatives (Kathryn Graue, John C. Smyth, and T.J. Janowski), in which Defendants purportedly admit that the substance of the

identified statements is communicated to customers.  (<u>Id.</u> at 16, 43-54 of 60.)

For example, Plaintiff points to the following testimony of NCG designee

Kathryn Graue:

> Q:     Have you ever told an NCG customer that a rebottled unit
>        will perform the same as new?
>
> A:     If the performance requirements are the same.
>
> Q:     So you have said that?
>
> A:     If what they are currently using is new, we could meet the
>        same performance requirements.

(Pl.'s App'x, Dkt. [227] Tab F, 11/5/10 Dep. of NCG (Kathryn Graue,

Designee), at 156:14-20.)  Plaintiff also relies on the following testimony of

John Smyth:

> Q:     Is the equal quality and certification of reconditioned
>        packaging something you would communicate to a customer
>        or potential customer in a sales call?
>
> A:     Depending on your definition of quality, sure.  Yes.  I mean,
>        you cannot package a food-grade product in a reconditioned
>        container; so, you know, it's not a food-grade quality
>        container.
>
> Q:     Based on your understanding of what "quality" means,
>        would this be something you communicate?
>
> A:     Based on my definition of the word "quality"?

Q:     Yes.

A:     Yes.

(Id. Tab CC, 1/28/11 Dep. of J. Smyth, at 137: 8-22.)

The Court finds Plaintiff's argument to be of no avail.  To prevail on a

Lanham Act false advertising claim, a claimant must prove that the accused

statement was made in "commercial advertising or promotion."  As stated

above, Plaintiff concedes that the specifically identified statements (Statements

2, 4, and 7-9) were never disseminated to customers; Plaintiff nonetheless

contends that the "commercial advertising or promotion" requirement is

satisfied by deposition testimony that statements *similar to* those specifically

identified are disseminated to customers.  However, testimony that a general

message is or has been conveyed to unspecified customers, at an unspecified

time, in an unspecified manner, and by unspecified persons is insufficient to

satisfy the threshold requirement of a Lanham Act claim–that the accused

statements were made in "commercial advertising or promotion."  Having failed

to show that accused Statements 2, 4, or 7-9 were disseminated to customers, no

reasonable jury could find them to have been made in "commercial advertising

or promotion."  The fact that similar messages may have been conveyed to an

79

unidentified number of consumers at an unidentified time and in an unidentified

manner does not change this result.  See, e.g., Minsurg Int'l, Inc. v. Frontier

Devices, Inc., No. 8:10-cv-1589-T-33EAJ, 2011 WL 1326863, at *4 (M.D. Fla.

Apr. 6, 2011) (dismissing Lanham Act claim where plaintiff failed to allege "to

whom the false advertisements were made" and "the alleged breadth of the

dissemination"); see also discussion at sub-section (b.), infra (analyzing

meaning of "commercial advertising or promotion" in context of accused

Statements 1 and 11-14).  Accordingly, Defendants are entitled to summary

judgment on Plaintiff's Lanham Act claim to the extent it is based on

Statements 2, 4, or 7-9.

### b.    Statements 1 and 11-14

Defendants argue that Statement 1 is not actionable as a matter of law

because it was distributed only to Defendants' customers in Europe and not to a

single customer in the United States.  (Defs.' False Advertising & Unjust

Enrichment Mot. for Summ. J., Dkt. [215] at 13 of 39.)  Statement 1 is

contained in a letter signed by Mauser/ NCG representatives Siegfried Weber

and Jörg Fassbender.  (App'x of Ex. to Defs.' False Advertising & Unjust

Enrichment Mot. for Summ. J. ("Defs.' False Advertising & Unjust Enrichment

AO 72A
(Rev.8/82)

App'x"), Dkt. [216] Tab Y.)  Plaintiff disputes that this statement was sent only

to European customers and argues that it was likewise distributed to customers

in the United States.  (Pl.'s Response to Defs.' False Advertising & Unjust

Enrichment SMF, Dkt. [229] ¶ 28; Pl.'s Consolidated Statement of Additional

Facts in Response to Defs. Mots. for Summ. J. ("Pl.'s Consolidated SAF"), Dkt.

230 ¶ 61 ("The letter containing [accused Statement 1] has been sent to

customers that purchase products in the United States.").)  Plaintiff does not

elaborate, however, regarding to whom, by whom, or when this letter allegedly

was so disseminated.

Defendants argue that Statements 11-14 are not actionable as a matter of

law because they were not sufficiently disseminated to constitute "commercial

advertising or promotion," as each was disseminated only to one or two of

Defendants' U.S. customers.  (Id. at 13-14 of 39.)  The undisputed evidence

establishes that Statement 11 is part of an email sent by Thaddeaus Janowski,

Mauser's Director of Customer Relations and Product Management, to Terry

Bruring, a representative of Dow Latex Supply Chain.  (Defs.' False

Advertising & Unjust Enrichment SMF, Dkt. [216] ¶ 48.)  Statement 12 is also

part of an email, which was sent by Steve Levinsky, a Mauser sales

representative, to Iretta Gaskill, a purchasing agent for Daikin America.  (Id. ¶ 51.)  Statement 13 is contained in a memorandum from NCG to Jeff Semler of Hexicon Speciality Chemicals.  (Id. ¶ 53.)

Statement 14 is contained in a presentation entitled "Mauser Eco-Cycle." (Id. ¶ 55.)  Unlike Statements 11-13, and like Statement 1, the parties do not agree on the extent to which Statement 14 was disseminated.  Defendants contend this presentation was given to only two customers in the United States–Exxon Mobil and EcoLab.  (Id. ¶ 56.)  Plaintiff, however, denies and disputes this allegation, pointing to deposition testimony of T.J. Janowski that Mauser uses a standard PowerPoint template from which to make customer presentations, which template contains information about Mauser's Eco-Cycle program.  (Pl.'s App'x, Dkt. [227] Tab H, 12/2/10 Dep. of T.J. Janowski, at 44:15-45:21.)  Presumably, Plaintiff contends that this standard template incorporates part or all of the Eco-Cycle presentation, which through the standard template, thus is disseminated to a wider group of customers.

To resolve Defendants' motion for summary judgment with respect to these statements, the Court must consider the meaning of "commercial advertising or promotion" under the Lanham Act.  The Act does not define the

phrase "commercial advertising or promotion," nor does its legislative history shed any light on the phrase's meaning. <u>Seven-Up Co. v. Coca-Cola Co.</u>, 86 F.3d 1379, 1383 (5th Cir. 1996) (noting that Act's legislative history addresses only requirement that advertising or promotion be "commercial"); <u>Fashion Boutique v. Fendi USA, Inc.</u>, 314 F.3d 48, 56 (2d Cir. 2002). Most courts have adopted a four-part test[22] for purposes of determining whether a statement qualifies as "commercial advertising or promotion." <u>Fashion Boutique</u>, 314 F.3d at 56 (citing cases); <u>Optimum Techs., Inc. v. The Home Depot USA, Inc.</u>, No. 1:04-cv-3260-TWT, 2005 WL 3307508, at *5 (N.D. Ga. Dec. 5, 2005) (citing cases).

Under this test, a statement constitutes "commercial advertising or promotion" if it is: "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing customers to buy defendant's goods and services"; and "(4) . . . disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or promotion' within that industry." <u>Seven-Up</u>, 86 F.3d at 1384. With respect to

---

[22] This test was originally articulated in <u>Gordon & Breach Science Publishers S.A. v. Am. Inst. of Physics</u>, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. 1994).

the last factor, the accused statement need not have been made in a "classical

advertising campaign"; statements made in more informal types of speech may

nonetheless constitute "commercial advertising or promotion." Id. (citing

Gordon & Breach, 859 F. Supp. at 1535-1536.)  While the Eleventh Circuit has

not yet addressed this issue, several courts in this Circuit have adopted and

applied the four-part test in determining whether an accused statement falls

within the scope of the Lanham Act.  See Ameritox, Ltd. V. Millennium Labs.,

Inc., NO. 8:11-cv-775-T-24-TBM, 2012 WL 33155, at *2 (M.D. Fla. Jan. 6,

2012) (applying test); Optimum Techs., 2005 WL at *5 (same); Geller v.

Hagens, No. 8:10-cv-01688-EAK-AEP, 2012 WL 279436, at *3 (M.D. Fla. Jan.

31, 2012) (applying test and citing other district courts in this circuit to do

same).  The Court finds this test to be sound.

Applying the test to the facts of this case, the Court need only determine

whether Statements 1 and 11-14 satisfy the fourth prong, as Defendants move

for summary judgment only on grounds that the statements were not sufficiently

disseminated to the purchasing public to constitute "advertising" or

"promotion" under the Lanham Act.  (Defs.' False Advertising & Unjust

Enrichment Mot. for Summ. J., Dkt. [215] at 13-14 of 39.)  To be "sufficiently

84

disseminated" to constitute "commercial advertising or promotion," the accused

statement must be "designed to disseminate information to the public" as part of

an "organized campaign to penetrate the relevant market." <u>Fashion Boutique</u>,

314 F.3d at 57; <u>Optimum Techs.</u>, 2005 WL at *5. Thus, courts generally have

held that "isolated statements by sales personnel to individual customers do not

satisfy the requirement of sufficient dissemination." <u>Optimum Techs.</u>, 2005

WL at *5 (citing cases). <u>See also</u> <u>Fashion Boutique</u>, 314 F.3d at 57 ("Proof of

widespread dissemination within the relevant industry is a normal concomitant

of meeting this requirement. Thus, business harmed by isolated disparaging

comments do not have redress under the Lanham Act; they must seek redress

under state-law causes of action.")

At the same time, however, courts have recognized that "the level of

circulation required to constitute advertising and promotion will undeniably

vary from industry to industry and from case to case." <u>Seven Up</u>, 86 F.3d at

1385 (citing <u>Am. Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.</u>, 820 F.

Supp. 1072, 1078 (N.D. Ill. 1993)). Thus, "[w]here the potential purchasers in

the market are relatively limited in number, even a single promotional

presentation to an individual purchaser may be enough to trigger the protections

85

of the Act." Seven Up, 86 F.3d at 1386.  For example, the Seven Up court

found the requirement of "sufficient dissemination" satisfied where the accused

statements were made to eleven of only seventy-four relevant potential

consumers.  Id. at 1386-87.  And in Mobius Management Systems, Incorporated

v. Fourth Dimension Software, Incorporated, the court held that a letter sent to a

single customer could satisfy this requirement where, among other things, the

relevant purchasing public was "quite small."  880 F. Supp. 1005, 1021.  Contra

Fashion Boutique, 314 F.3d at 58 (finding "no organized campaign to penetrate

the marketplace" where the plaintiff presented a total of twenty-seven accused

oral statements in a marketplace of thousands of customers).

The Court finds that Plaintiff has failed to present sufficient evidence

from which a jury reasonably could find accused Statements 1 and 11-14 to

have been sufficiently disseminated to consumers to constitute "commercial

advertising or promotion."  The evidence shows that Statements 11-13 were

disseminated to only one customer, that Statement 14 was made in a

presentation given to only two, and that Statement 1 was distributed only to

AO 72A
(Rev.8/82)

customers in Europe.[23]  It is true that under certain circumstances–e.g., where

the customer market is particularly small–courts may find a statement to be

sufficiently disseminated to constitute "commercial advertising or promotion,"

even though only distributed to a few customers (or even one).  In this case,

however, the Court cannot do so given Plaintiff's failure to put forward any

evidence regarding the number of potential consumers in the IBC market or the

size or importance of the consumers to whom the statements were disseminated.

Because Plaintiff has failed to put forward evidence from which a reasonable

jury could find Statements 1 or 11-14 to constitute "commercial advertising or

promotion," Defendants' motion for summary judgment is granted as to these

statements.

2.     *Literal Falsity*

With respect to the remaining statements, Statements 26, 27, 28, and 30,

Defendants seek summary judgment on grounds that the statements are not false

or misleading.  (Defs.' False Advertising & Unjust Enrichment Mot. for Summ.

_____

[23] Plaintiff's argument that Statements 1 and 14 were disseminated more widely
among U.S. customers does not create an issue of material fact regarding the extent of
dissemination given Plaintiff's failure to put forward any evidence regarding the
alleged dissemination.

AO 72A
(Rev.8/82)

J., Dkt. [215] at 17-26 of 39.)  Plaintiff contends that these statements are

literally false, rather than misleading.  The Court thus must determine whether

Plaintiff has presented sufficient evidence from which a reasonable jury could

find the statements to be false.  As stated in Part II.A., supra, in connection with

Plaintiff's motion for summary judgment on Defendants' false advertising

counterclaim, when determining whether an advertisement is literally false,

courts "must analyze the message conveyed in full context" and consider "the

face of the statement in its entirety . . . ."  Osmose, Inc., 612 F.3d at 1308

(internal quotation marks and citation omitted).  Only if the accused statement

is unambiguous may it be classified as literally false.  Id. at 1309.

Statements 26, 27, and 28, although worded differently, each makes the

same general claim: that Defendants restore used IBCs to their "original"

conditions or performance standards.  Specifically, accused Statement 26 reads

"restoring the container to its original condition."  (Defs.' False Advertising &

Unjust Enrichment Mot. for Summ. J., Ex. 1, Dkt. [215] at 38 of 39.)  Accused

Statement 27 reads, "We clean it [container] completely, conduct thorough

inspections, and replace worn closures, thus restoring the container to its

original condition.  So you can depend on getting exactly the performance and

quality you bargained for."[24]  (Id.)  Finally, Statement 28 reads, "We clean,

pressure test, and inspect each container meticulously, replacing suspect parts

and restoring the container to its previous performance standard."  (Id. at 38 of

39.)  Statements 26 and 27 appear in an NCG brochure entitled, "National

Container Group: Maximizing Value Through Reconditioning."  (Defs.' False

Advertising & Unjust Enrichment SMF, Dkt. [216] ¶¶ 80-81; App'x of Ex. to

Defs.' False Advertising & Unjust Enrichment Mot. for Summ. J. (Defs.' False

Advertising & Unjust Enrichment App'x"), Dkt. [216], Tab QQ.)  Statement 28

appears on NCG's website on a page discussing "quality and the environment."

(Defs.' False Advertising & Unjust Enrichment SMF, Dkt. [216] ¶ 117.)

        Plaintiff contends that Statements 26, 27, and 28 "plainly and literally

claim" that NCG restores its products to their original conditions and original

performance standards–which claims are literally false with respect to cross-

bottled IBCs.  (Pl.'s Consolidated Opp'n, Dkt. [227] at 46 of 60.)  Defendants

contend, however, that Plaintiff cannot prove these statements to be literally

_____

        [24] As Defendants point out (Defs.' False Advertising & Unjust Enrichment
Mot. for Summ. J., Dkt. [215] at 19 n.9 of 39), Statement 26 is a fragment taken from
Statement 27 and thus does not provide a potential basis for liability independent of
Statement 27.

false because the statements never refer to cross-bottled IBCs. (Defs.' False Advertising & Unjust Enrichment Mot. for Summ. J., Dkt. [215] at 19-21 of 39.) That is, because Plaintiff's theory of literal falsity concerns only the meaning of the statements as applied to cross-bottled products, and because the statements do not mention cross-bottled products, Defendants contend the statements cannot be found to be literally false. (Id.)

The Court finds Defendant's argument–which appears to be a sort of ambiguity argument–to be of no avail. Contrary to Defendants' argument, the statements need not explicitly reference cross-bottled products to be found literally false with respect to them. The statements unambiguously assert that NCG restores *all* of its products to their original condition when it reconditions them. This would include cross-bottled products. The only question for the Court is therefore whether Plaintiff has presented sufficient evidence from which a reasonable jury could find these assertions to be literally false as applied to the cross-bottled product at issue in this case.

As stated above, Statements 26 and 27 appear in an NCG brochure entitled, "National Container Group: Maximizing Value Through Reconditioning." (Defs.' False Advertising & Unjust Enrichment App'x, Dkt.

[216], Tab QQ.)  The entire brochure is dedicated to promoting the reconditioning business.  It extolls the benefits of reconditioning in terms of cost savings to the consumer and reduction of environmental waste.  The brochure does not specifically reference cross-bottled products (or Plaintiff) but instead refers to Defendants' reconditioned IBCs, generally.

For example, under the heading "Wasting less and saving more," the brochure reads, "[C]onsider saving money by not spending it on new containers when they aren't needed. [NCG] . . . helps you spend less–often much less–when you can use reconditioned containers instead."  Elsewhere the brochure claims, "Our industry is intrinsically good for the environment.  After all, instead of discarding containers, we clean them, inspect them, test them, refurbish them, wherever necessary and offer them for re-use."  The paragraph in which accused Statement 27 appears reads in full, "NCG checks every container under pressure with new ultrasonic technology.  We clean it completely, conduct thorough inspections, and replace worn closures, thus restoring the container to its original condition.  So you can depend on getting exactly the performance and quality you bargained for."

91

Plaintiff contends that the "original condition" assertion in Statement 26/ 27 is literally false with respect to cross-bottled IBCs because when NCG replaces the Schütz bottle with a Mauser bottle, the resulting product is materially different from and not restored to the original condition of a Schütz/ Schütz IBC. (Pl's Consolidated Opp'n, Dkt. [227] at 46-47 of 60.) Plaintiff elaborates: "NCG could, if it wished, recondition Schütz IBCs by replacing the used Schütz bottle with an identical replacement Schütz bottle. Such bottles are available, but NCG chooses not to buy them. Instead, it uses a Mauser bottle that was not designed for a Mauser cage . . . ." (Id. at 24 of 60.)

In support of its argument that the cross-bottled IBC is materially different and therefore not restored to the original condition of a Schütz IBC, Plaintiff presents evidence that the Schütz IBC and cross-bottled IBC are of a different design. As discussed in Part III.A.2., supra (in connection with Defendants' motion for summary judgment on Plaintiff's trademark claims and the Court's likelihood of confusion analysis), the Schütz IBC consists of a Schütz cage and a Schütz bottle designed to fit that particular cage. (Id. at 10 of 60.) The Mauser IBC, on the other hand, consists of Mauser's own cage and plastic bottle, neither of which is designed by Schütz. (Id. at 13 of 60.) The

92

Mauser bottle is specifically designed for the Mauser cage: it has indentations on its four side walls that line up with the vertical metal bars of the Mauser cage.  (Id. at 25 of 60.)

When this bottle is placed inside a Schütz cage, however, the indentations do not match up with the bars of the cage.  (Pl.'s App'x, Dkt. [227] Tab D, 11/4/2010 Dep. of National Container Group (Michael Porreca, Designee), at 23:25-24:16; Tab DD, Am. Expert Report of Sher Paul Singh, PhD., ¶ 33.) Thus, when Defendants take a Schütz IBC and replace the Schütz bottle with a Mauser bottle, the resulting IBC is of a different design and cannot be said to have been restored to its original condition.  (See id. Tab E, 3/10/2011 Dep. of Mike Porecca, at 118:8-22 (explaining in the case of an NCG cross-bottled IBC, "[I]t had no original condition.  It was a cage and a bottle and when I combine them I get a new product, an IBC manufactured by NCG using a Schütz component and a Mauser component. . . .  The original condition is when I put it together.").)  (See also id. Tab UU, at Schutz_NCG - 0113684 (UN newsletter describing cross-bottled IBCs as being of a "different design type").)

The Court finds that Plaintiff has produced sufficient evidence from which a reasonable jury could find Statements 26 and 27 to be literally false.

93

That is, based on the evidence described above, a reasonable jury could find

that Defendants do not restore cross-bottled IBCs to their original conditions.

Defendants are thus not entitled to summary judgment as to Statement 26/ 27 on

grounds that they cannot be proven to be false.

With respect to the "original performance" assertions found in Statements

27 and 28, Plaintiff argues literal falsity on grounds that NCG's cross-bottled

IBCs do not perform as well as the Schütz IBC–the original product. (Pl.'s

Consolidated Opp'n, Dkt. [227] at 47 of 60.) In support of this argument,

Plaintiff points to the expert report of Dr. Sher Paul Singh. (<u>Id.</u>) As discussed

in Part III.A.2., <u>supra</u>, Dr. Singh conducted various tests, including vibration,

compression strength, horizontal impact, hydrostatic pressure, and leakproof

testing, designed to compare the performance of a reconditioned Schütz IBC

with a reconditioned cross-bottled IBC. (Pl.'s App'x, Dkt. [227] Tab DD,

Singh Expert Report.) As a result of these tests, Dr. Singh concluded that the

cross-bottled IBC is weaker than the Schütz IBC and fails more easily for

similar levels of vibration and compression, and that the cross-bottled IBC is

less safe than the Schütz IBC for the transportation of hazardous and non-

hazardous materials. (<u>Id.</u> Tab DD, Singh Expert Report, at 36.) In further

94

support of its falsity argument, Plaintiff presents evidence that Schütz IBCs are tested and certified at a higher hydrostatic pressure performance standard (100 kPa) than Defendants' cross-bottled IBCs (80 kPa).  (Id. Tab XX at 3, 15; Tab I, Ex. 272.)

The Court finds this evidence sufficient to create an issue of material fact as to whether Defendants' cross-bottled IBCs can, in fact, be restored to their original performance standards.  Because a reasonable jury could find–based on this evidence–that cross-bottled IBCs do not perform at the same level as an original Schütz/ Schütz IBC, Defendants are not entitled to summary judgment as to Statements 27 and 28 on grounds that they cannot be proven to be false.

Finally, the Court must consider Statement 30.  Statement 30 reads, "We Offer: 275 & 330 New bottle and Reconditioned Totes," "White (UV Protection) Bottles / EPA One-way Valves / 3" Valve / Part Sales."  (Defs.' False Advertising & Unjust Enrichment Mot. for Summ. J., Ex. 1, Dkt. [215] at 38 of 39.)  This statement appears on a flyer below side-by-side pictures of a Mauser IBC and Schütz IBC.  (Defs.' False Advertising & Unjust Enrichment SMF, Dkt. [216] ¶ 127.)  Defendants' business logos appear in the top left corner of the flyer, which reads at the top, "Announcing our competitive

95

advantage! Mauser Manufactures Bottles on the West Coast!" (Pl.'s App'x, Dkt. [227], Tab N, Ex. 84.)  The Court finds that Plaintiff has failed to produce any evidence that this statement is literally false.  Indeed, Plaintiff has failed to raise a single argument in its brief as to why Statement 30, in particular, could be found to be literally false.[25]  Having failed to come forward with evidence to create a triable issue of fact as to whether Statement 30 is false, Defendants are entitled to summary judgment as to this statement.

### 3.    Actual Injury

Finally, with respect to each accused statement, Defendants seek summary judgment on the added ground that Plaintiff cannot prove "injury and a causal link between the injury and the [accused statements]," which Defendants contend is an essential element in proving liability for false

---

[25] The only argument Plaintiff appears to have raised regarding the alleged falsity of Statement 30, which argument does not appear in its brief, is as follows: "the statement is false because '[NCG] has on the brochure a Schütz IBC, and the statement is that Mauser is the only manufacturer on the West Coast with a 275-gallon bottle, which means that you would be putting the Mauser bottle into the Schütz cage, and the brochure shows a Schütz [bottle] in a Schütz cage.'" (Defs.' False Advertising & Unjust Enrichment SMF, Dkt. [216] ¶ 130 (citing App'x of Ex., Dkt. [216], Tab U, 12/16/2010 Dep. of B. Minnich, at 165:22-166:10.)  This argument, however, concerns only Plaintiff's interpretation of the accused statement.  Plaintiff has not put forward any evidence that the consumer public would interpret the statement in the same way. (Indeed, the Court strains to read the statement in this way.)

advertising.  (Defs.' False Advertising & Unjust Enrichment Mot. for Summ. J.,

Dkt. [215] at 26-27 of 39.)  Plaintiff, on the other hand, argues that a showing

of actual injury is not required to establish liability under the Lanham Act.

(Pl.'s Consolidated Opp'n, Dkt. [227] at 53-55 of 60.)  The Court agrees with

Plaintiff and finds that Plaintiff is not required to prove actual injury to prevail

on its false advertising claim.

As stated earlier and throughout this Order, the Lanham Act creates a

cause of action for a person who "is or is *likely to be* damaged" by false

advertising.  15 U.S.C. § 1125(a)(1)(B).  The well-settled elements of the claim,

as set forth elsewhere in this Order, are that:

> "(1) the ads of the opposing party were false or misleading, (2) the
> ads deceived, or had the capacity to deceive, consumers, (3) the
> deception had a material effect on purchasing decisions, (4) the
> misrepresented product or service affects interstate commerce, and
> (5) *the movant has been–or is likely to be–injured* as a result of the
> false advertising."

Johnson & Johnson Vision Care, Inc., 299 F.3d at 1247 (citation omitted)

(emphasis added).  Actual injury is not a necessary element of a false

advertising claim.  Keg Techs., Inc. v. Laimer, 436 F. Supp. 2d 1364, 1373

(N.D. Ga. 2006).  Accordingly, even if Plaintiff could not ultimately prove

actual injury, it could still establish liability under the Lanham Act. Defendants are thus not entitled to summary judgment as to any accused statement on this ground.

In accordance with the foregoing, Defendants' motion for summary judgment on Plaintiff's Lanham Act false advertising claim (Count III) is **GRANTED** as to Statements 1, 2, 4, 7-9, 11-14, and 30.[26] The motion is **DENIED** as to Statements 26-28.

B.    State Law False Advertsing Claims (Counts IV-VI)

In accordance with the Court's ruling in Part IV.A., supra, Defendants' motion for summary judgment on Plaintiff's state law trademark claims (Counts IV-VI) is **GRANTED** as to Statements 1, 2, 4, 7-9, 11-14, and 30.[27] The motion is **DENIED** as to Statements 26-28. (See Defs.' False Advertising & Unjust Enrichment Mot. for Summ. J., Dkt. [215] at 8 n.1 of 39; Pl.'s Consolidated Opp'n, Dkt. [227] at 57 n.35 of 60 (both stating that Plaintiff's

_____

[26] It is also granted as to Statements 3, 5-6, 10, 15-25, 29, and 31-36, which Plaintiff has withdrawn.

[27] The motion is also granted as to the withdrawn statements listed in footnote 26 of this Order.

AO 72A
(Rev.8/82)

state law false advertising claims rise or fall with Plaintiff's Lanham Act false advertising claim).)

C.    Unjust Enrichment Claim (Count VII)

Finally, Defendants move for summary judgment on Plaintiff's claim for unjust enrichment. In the unjust enrichment count of Plaintiff's Complaint (Count VII), Plaintiff alleges that "Defendants' direct and contributory actions in the advertising, marketing, promotion and sale of their goods . . . have been conducted with the purpose and effect of deriving unjust benefit from deceiving and misleading the public as to the nature, character and origin of Defendants' products." (Compl., Dkt. [1] ¶ 54.)

Under Georgia law, "[t]he theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated." Smith Serv. Oil v. Parker, 549 S.E.2d 485, 487 (Ga. Ct. App. 2001). To prevail on a claim for unjust enrichment, a plaintiff thus must ultimately prove (1) that it conferred a benefit on the defendant and (2) that equity requires the defendant to compensate for that benefit. SCQuARE Int'l, Ltd. v. BBDO Atlanta, Inc., 455 F. Supp. 2d 1347, 1373 (N.D. Ga. 2006). Defendants argue that Plaintiff's claim for unjust

enrichment fails as a matter of law because Plaintiff cannot show it conferred

any benefit on Defendants, and because Plaintiff cannot show any wrongdoing

on the part of Defendants, given that Plaintiff's claims for trademark

infringement and false advertising are "fatally flawed." (Defs.' False

Advertising & Unjust Enrichment Mot. for Summ. J., Dkt. [215] at 28-29 of

39.) The Court disagrees.

The Court finds that issues of material fact preclude summary judgment

on Plaintiff's unjust enrichment claim. As set forth in detail above, the Record

contains evidence supporting Plaintiff's claims for trademark infringement and

false advertising. There is also evidence that Defendants benefitted from this

alleged wrongdoing in the form of increased customer accounts and sales.

(Pl.'s Consolidated SAF, Dkt. [230] ¶¶ 63, 64.) In other words, there is

evidence that Defendants received a benefit from their unauthorized use of

Plaintiff's trademark. Finally, a jury reasonably could conclude that failure to

compensate for this benefit would be unjust. Accordingly, the Court finds

issues of material fact precluding Defendants' motion for summary judgment on

Plaintiff's unjust enrichment claim. The motion is accordingly **DENIED**.

## Conclusion

In accordance with the foregoing, Plaintiff's Motion for Leave to File Surreply in Opposition to Defendants' Motion for Summary Judgment **[274]** is **DENIED**. Schütz Container Systems, Inc.'s Motion for Summary Judgment on Defendant National Container Group, LLC's Counterclaims **[184]** is **GRANTED**. Defendants Mauser Corporation and National Container Group, LLC's Motion for Summary Judgment on Plaintiff's Trademark Claims (Counts II, IV-VI) **[187]** is **DENIED**.

Finally, Defendant Mauser Corporation and National Container Group, LLC's Motion for Summary Judgment on Plaintiff's False Advertising Claims (Counts III-VI) and Unjust Enrichment Claim (Count VII) **[188]** is **GRANTED in part and DENIED in part**. The motion is **GRANTED** as to Plaintiff's False Advertising Claims (Counts III-VI) to the extent these claims are based on accused Statements 1, 2, 4, 7-9, 11-14, and 30;[28] the motion is **DENIED** to the extent these claims are based on Statements 26-28. The motion is **DENIED** as to Plaintiff's Unjust Enrichment Claim (Count VII).

---

[28] The motion is also granted to the extent it is based on accused Statements 3, 5-6, 10, 15-25, 29, and 31-36, which Plaintiff has withdrawn.

AO 72A
(Rev.8/82)

**SO ORDERED**, this __28th__ day of March, 2012.


_____
**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)